In re: Adoption of R.J.S.

Appeal of: R.J.S., Sr., Natural Father

In re: Adoption of J.S.

Appeal of: Chester County Department of Children, Youth and Families

In re: Adoption of J.S., a Minor.

Superior Court of Pennsylvania.

Argued Jan. 31, 2006.
Filed May 30, 2006.

Ira D. Binder, Oxford, for R.J.S., Sr.

Barbara W. Miller, Chester Springs, for R.J.S. and J.S.

Gerald K. McOscar, West Chester, for D.L., participating party.

Lawrence J. Persick, West Chester, for CYS, participating party.

BEFORE: McCAFFERY, PANELLA, and JOHNSON, JJ.

OPINION BY McCAFFERY, J.:

¶ 1 Appellant, R.J.S., Sr. ("Father"), appeals from the trial court order terminating his parental rights to his two minor sons, R.J.S. and J.S. Father specifically argues that his parenting efforts were stymied by the court's prior custody order barring him from any contact with the children. In a cross-appeal, Chester County Department of Children, Youth and Families ("DCYF"), appeals from the order denying its petition to terminate the parental rights of D.E.S. ("Mother"). DCYF contends that it has proven the

statutory requirements for termination of Mother's parental rights under 23 Pa. C.S.A. § 2511(a)(8), to wit, that the children have been removed from the parent for at least twelve months, that the conditions which led to the removal still exist, and that termination of Mother's rights would best serve the needs and welfare of the children. Upon review, we affirm the order terminating Father's parental rights, but we vacate the order regarding Mother's parental rights and remand for proceedings to address the needs and welfare of the children.

¶ 2 The facts and procedural history underlying this appeal are as follows. Mother and Father are the parents of two sons, R.J.S., born on January 20, 1996, and J.S., born on February 15, 1997. Mother was seventeen (17) years of age at the time of the first child's birth, and she and Father never married. In late 1996, Father was arrested after he repeatedly stabbed Mother, who was pregnant with the second child. Father was convicted by a jury in 1997 of aggravated assault and related offenses, and sentenced to eight (8) to twenty (20) years in prison. A custody order from October 2001, mandated that Father was to have no contact with the children.

¶ 3 DCYF involvement with the family began in 1997. On December 10, 2001, the children were adjudicated dependent, based on lack of proper parental care and control, after DCYF repeatedly found the children without supervision. Legal and physical custody of the children was granted to their maternal grandmother. DCYF was to provide to Mother a service known as Life Skills, which is an individualized service designed to aid clients in resolving the problems that had led to their children's dependency. Mother was ordered to work with Life Skills, to obtain housing and employment, and to have supervised visits with the children.

¶ 4 Regular review hearings were conducted through the end of 2002. At some point during this time, legal custody of the children was transferred to DCYF, although they remained in the physical custody of a family member. On February 13, 2003, a permanency review hearing was held, following which physical custody was transferred to DCYF and the children were placed in foster care. The problems necessitating the foster care placement at that time were lack of housing, neglect of the children, and dental neglect. A permanency goal of reunification was established.

¶ 5 In August 2003, Mother moved to Puerto Rico with her paramour, L.F.R.,[1] and remained there until February 2004. Mother's only contact with the children during this time was a single letter.

¶ 6 After additional permanency hearings on March 2, March 31, and May 11, 2004, the court ordered a goal change on September 17, 2004, from reunification to adoption. The court found minimal compliance by Mother with the reunification plan and little progress toward alleviating the circumstances that had led to placement of the children. In addition, the court authorized DCYF to file petitions to terminate parental rights to the children.

¶ 7 On October 28, 2004, DCYF filed petitions for termination of the parental rights of both Mother and Father. A termination hearing was held on April 5, 2005, which incorporated the testimony and exhibits from the hearings in March and May 2004. Additional testimony was presented from the DCYF adoption case-

---

1. Mother and L.F.R. are the parents of a daughter, S.M.R., born November 2, 1999. She is not the subject of the instant appeal.

worker, from Mother, and from L.F.R., who had become Mother's fiancé by then. Father failed to appear, even though he had been paroled from prison, had been served with notice of the termination petition and hearing, and had court-appointed counsel. By order dated May 16, 2005, the court terminated Father's parental rights, based on its finding that Father had never parented the children. However, the court denied DCYF's petition to terminate Mother's parental rights. The court's decision was based on its conclusion that in the six months preceding the hearing, Mother and her fiancé had made progress in overcoming obstacles and improving their situation, with the goal of eventually regaining custody of the children.

¶ 8 Father filed a timely appeal, and DCYF then cross-appealed, challenging the denial of termination of Mother's parental rights.

¶ 9 Father presents one issue for our review:

> Did the trial court err as a matter of law or commit an abuse of discretion by involuntarily terminating [Father's] parental rights pursuant to 23 Pa.C.S.A. Section[s] 2511(a)(1), (a)(2), (a)(5), (a)(8)[?]

(Father's Brief at 4). Father's argument is that he was prevented from participating in his sons' lives during the time he was in prison because of the custody order from October 2001, that proscribed any contact. Father insists that he had been unable to modify the custody order, despite numerous efforts, and that this inability had prevented him from participating in the dependency actions. We disagree with Father's assertion.

¶ 10 DCYF also presents one issue for our review:

> Whether the orphans' court erred in denying the petitions for termination of parental rights of the children's mother, where clear and convincing competent evidence established that the statutory grounds for termination existed, and that the needs and welfare of the children would best be served by the termination of parental rights?

(DCYF's Brief at 4). We agree with DCYF's contention that Mother's conduct met the statutory grounds for termination. However, we conclude that insufficient evidence was offered regarding the needs and welfare of the children, particularly with regard to emotional bonds with Mother, to determine whether their best interests would be served by termination of Mother's parental rights.

¶ 11 In an appeal from an order terminating parental rights, "we are limited to determining whether the decision of the trial court is supported by competent evidence." *In re In the Interest of S.H.*, 879 A.2d 802, 805 (Pa.Super.2005), *appeal denied*, 586 Pa. 751, 892 A.2d 824 (2005) (quoting *In re C.S.*, 761 A.2d 1197, 1199 (Pa.Super.2000)). "We are bound by the findings of the trial court which have adequate support in the record so long as the findings do not evidence capricious disregard for competent and credible evidence." *In re M.G.*, 855 A.2d 68, 73 (Pa.Super.2004) (quoting *In re Diaz*, 447 Pa.Super. 327, 669 A.2d 372, 375 (1995)). The trial court, not the appellate court, is charged with the responsibilities of evaluating credibility of the witnesses and resolving any conflicts in the testimony. *Id.* at 73–74; *In re Adoption of A.C.H.*, 803 A.2d 224, 228 (Pa.Super.2002). In carrying out these responsibilities, the trial court is free to believe all, part, or none of the evidence. *M.G.*, *supra* at 73–74. When the trial court's findings are supported by competent evidence of record, we will affirm "even if the record could also support an opposite result." *S.H.*, *supra* at 806 (citation omitted). Absent an

abuse of discretion, an error of law, or insufficient evidentiary support, the trial court's termination order must stand. *In re C.M.S.*, 884 A.2d 1284, 1286 (Pa.Super.2005).

¶ 12 Before filing a petition for termination of parental rights, the Commonwealth is required to make reasonable efforts to promote reunification of parent and child. *In re Adoption of M.E.P.*, 825 A.2d 1266, 1276 (Pa.Super.2003). However, the Commonwealth does not have an obligation to make such efforts indefinitely. The Commonwealth has an interest not only in family reunification but also in each child's right to a stable, safe, and healthy environment, and the two interests must both be considered. *Id.* "A parent's basic constitutional right to the custody and rearing of his or her child is converted, upon the parent's failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." *In re B.L.W.*, 843 A.2d 380, 388 (Pa.Super.2004) (*en banc*), *appeal denied*, 581 Pa. 668, 863 A.2d 1141 (2004) (quoting *In re B.L.L.*, 787 A.2d 1007, 1013–14 (Pa.Super.2001)). When reasonable efforts to reunite a foster child with his or her biological parents have failed, then the child welfare agency must work toward terminating parental rights and placing the child with adoptive parents. The process of reunification or adoption should be *completed within eighteen (18) months. In re N.W.*, 859 A.2d 501, 508 (Pa.Super.2004) (citation omitted). While this time frame may in some circumstances seem short, it is based on the policy that "[a] child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting." *M.E.P., supra* (citation omitted).[2]

¶ 13 Termination of parental rights is controlled by statute. *See* 23 Pa.C.S.A. § 2511; *In re R.L.T.M.*, 860 A.2d 190, 192–93 (Pa.Super.2004). In relevant part, the statute provides as follows:

§ 2511. Grounds for involuntary termination

(a) General rule.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\* \* \* \* \* \*

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a

---

**2.** In 1998, our legislature amended the Juvenile Act, 42 Pa.C.S.A. §§ 6301–57, to conform to the requirements of the federal Adoption and Safe Families Act, 42 U.S.C. §§ 671 *et seq.*, and thereby committed this Commonwealth to ending foster care limbo, where children remained in placement indefinitely. *See In re N.W.*, 859 A.2d 501, 508 (Pa.Super.2004).

reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

\* \* \* \* \* \*

■■■ (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.[3]

(b) Other considerations.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511.

■■■ ¶ 14 Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. *In re*

*D.W.*, 856 A.2d 1231, 1234 (Pa.Super.2004). Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). *In re B.L.L.*, 787 A.2d 1007, 1013–14 (Pa.Super.2001). Only after determining that the parent's conduct warrants termination of his or her parental rights must the court engage in the second part of the analysis: determination of the needs and welfare of the child under the standard of best interests of the child. *C.M.S., supra*, 884 A.2d at 1286–87; *A.C.H., supra*, 803 A.2d at 229; *B.L.L., supra*. Although a needs and welfare analysis is mandated by the statute, it is distinct from and not relevant to a determination of whether the parent's conduct justifies termination of parental rights under the statute. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child. *C.M.S., supra* at 1287.

■■■ ¶ 15 Mindful of all of the above principles, we first address Father's appeal. The trial court concluded that terminating Father's parental rights was warranted under each of DCYF's proffered sections of the code, *i.e.* Sections 2511(a)(1), (a)(2), (a)(5), and (a)(8). Father insists that his efforts to parent his sons were stymied by the October 2001 custody order that proscribed any contact. He claims that he attempted several times during the period of his incarceration to change the custody order, all to no avail. However, the record contains *no* evidence, other than Father's testimony,[4] that he

---

**3.** We emphasize that satisfaction of the requirements in only *one* subsection of Section 2511(a), along with consideration of the provisions in Section 2511(b), is sufficient for

termination. *In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super.2004) (*en banc*).

**4.** Father testified by telephone from prison on March 31, 2004. (*See* Notes of Testimony

took *any* concrete steps to modify the custody order or that he was rebuffed by the court. To the contrary, the evidence suggests that Father did not pursue the avenues that were open to him for assistance through DCYF.

¶ 16 The testimony of Elysa Katz, a DCYF foster care caseworker who was assigned to this case from March 2003, to July 2004, suggests that Father did not take advantage of her offers of assistance with regard to the no-contact order:

> Ms. Katz: [Father]—the issue I have been addressing with him is the no-contact family court order. He has sent letters to the children. I sent them back. I identified what he needed to do to get the family court order modified. I requested once he did that or if he needed assistance, to contact me and mail me what was sent back from family court. He never mailed me back the requested information.
>
> Counsel: Okay. So you sent him—did you send him letters?
>
> Ms. Katz: I responded to every letter that [Father] sent me, and I would update [him] on his children. Although I wasn't allowed to give him a lot of information, I gave him what information I could.
>
> Counsel: How frequently did you write letters to [Father]?
>
> Ms. Katz: One every few months. Whenever he would write to me, I would write him back. I would also send him a copy of a family service plan and placement amendments and request that be sent [back] to me and it was never sent back to me.
>
> Counsel: Okay. And you went—were you present in the courtroom today when [Father] testified [by phone from prison]?

("N.T."), 3/31/04, at 7–31; R.R. at 120a–44a).

> Ms. Katz: Yes, I was.
>
> Counsel: It appears that there is a dilemma between the family court that entered the custody order and the dependency court in that arguably one is telling him one thing and the other is telling him something else. Did you try to address this issue with him?
>
> Ms. Katz: The dependency court honored what Judge Cody ordered at family court.
>
> Counsel: Did you explain to him [sic]?
>
> Ms. Katz: I explained to him several times. He wouldn't listen to what I had to say. He finally tried to modify it through a number I gave him.
>
> Counsel: Did he, to your knowledge, file things with the family court to modify the custody order?
>
> Ms. Katz: He stated he did. I requested follow up from our conversations and never received anything from him.

(Notes of Testimony ("N.T."), 3/31/04, at 65–66; R.R. at 178a–79a). Father testified that Ms. Katz had been helpful and had advised him on numerous issues. (*Id.* at 13–13; R.R. at 126a–27a). However, there was no indication from either testimony or direct evidence that he had followed through with any of her attempts to advise and assist him.

¶ 17 A second caseworker, Kathy Fried, who took over the case from Ms. Katz in July 2004, testified at the termination hearing as to the lack of communication from Father even after he was paroled from prison:

> Counsel: How about [Father], have you ever had any contact with [Father]?
>
> Ms. Fried: No, I haven't. He was in prison when I first became involved [with the case]. I did send him a letter letting him know that I was the new

caseworker and giving him my phone number. I didn't hear anything from him. And it was from the children's attorney that I learned that he was out of prison in a halfway house, and I believe that was October of '04.

Counsel: Did you try to send anything to the halfway house?

Ms. Fried: No, but I did call there and there wasn't any acknowledgment that he was even there.

Counsel: To your knowledge, is there any entry [in DCYF's records] since you have been involved in the case or since May of 2004 that [Father] has tried to contact your agency relative to his children?

Ms. Fried: No, he hasn't tried to contact.

(N.T., 4/5/05, at 17–18; R.R. at 326a–27a). Thus, unrefuted evidence from the April 5, 2005 termination hearing indicated that Father had had *no* contact with DCYF since May 2004.

¶ 18 Father did not even appear at the termination hearing, although his court-appointed counsel did. The certified record includes an affidavit of service, indicating that Father was served with the petition for termination of parental rights on January 16, 2005, at the halfway house where he was residing.

¶ 19 After careful scrutiny of this record, we conclude that the trial court's decision to terminate Father's parental rights based on Section 2511(a)(1) is supported by ample, competent evidence. Fa-

ther's conduct for the six-month period immediately preceding the filing of the termination petition indicated a settled purpose of relinquishing his parental claim.[5] There is *no* evidence that Father made even the slightest effort to re-establish ties with his sons during the six-month period prior to the filing of the termination petition on October 28, 2004. Furthermore, there is *no* evidence that Father made any such effort even after he had been released from prison sometime in the fall of 2004. In addition, the evidence clearly shows that the children have no bond with Father. Father was incarcerated for assaulting Mother nearly ten years ago, when she was pregnant with the younger child, whom Father has never seen. Father has not seen the older boy since the child was approximately nine-months old. Testimony from one of the caseworkers revealed that the younger boy considers Mother's fiancé to be his dad. (N.T., 3/2/04, at 26–27; R.R. at 84a–85a). Thus, Father has never been a parent to his sons, never cared for them, and never provided for them (except perhaps for the first few months of the older boy's life). The evidence strongly supports the trial court's conclusion that termination of Father's parental rights would serve the needs and welfare of the children. Therefore, we hold that the trial court did not err in terminating Father's parental rights.[6]

¶ 20 We turn next to DCYF's contention that the trial court erred in denying its petition to terminate Mother's parental

---

**5.** Under Section 2511(a)(1), parental rights may be terminated if, for a period of at least six months, a parent *either* demonstrates a settled purpose of relinquishing parental claim to a child *or* fails to perform parental duties. *In the Matter of the Adoption of J.M.M.*, 782 A.2d 1024, 1030 (Pa.Super.2001). In addition to demonstrating a settled purpose of relinquishing parental claim to his

sons, Father has also failed to perform *any* parental duties.

**6.** Because we are affirming the trial court's order terminating Father's parental rights under Section 2511(a)(1), we need not address the other statutory sections proffered by DCYF.

rights. The trial court acknowledged that Mother had neglected her children, had drug-related problems, and had left the children in the custody of DCYF when she moved to Puerto Rico for six months. (Trial Court Adjudication, dated May 16, 2005, at 2). However, the trial court also found that recently, Mother had made progress in overcoming several obstacles in her life, had been successful in utilizing resources available to her, and had assumed some responsibility for her life. The trial court pointed specifically to Mother's procurement of housing and employment, and to her efforts to take courses at a community college and obtain counseling when she had the financial ability to do so. *Id.* at 3–5. The trial court also took note of the testimony of Mother's fiancé, who expressed a desire to marry Mother and to care for the children. *Id.* at 5. However, Kathy Fried, the caseworker who testified on behalf of DCYF, presented a less positive view of Mother's situation, suggesting that Mother had several times started to make some progress but then was not able to follow through and actually improve her situation. (N.T., 4/6/05, at 27, 30–31; R.R. at 336a, 339a–40a).

¶ 21 The trial court credited the testimony of Mother and her fiancé, concluding that DCYF had not borne its burden to prove that Mother could not remedy her situation within a reasonable time, such that the children might be returned to her. (Trial Court Adjudication, dated May 16, 2005, at 5). Since the trial court's conclusion is based upon a credibility determination, we must extend to it appropriate deference. The trial court's conclusion focuses on certain elements of Sections 2511(a)(2) and (a)(5). Specifically, under Section 2511(a)(2), DCYF must show that "the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent." Similar-

ly, under Section 2511(a)(5), DCYF must show that "the parent cannot or will not remedy [the conditions which led to the removal or placement of the child] within a reasonable period of time." We will not disturb the trial court's conclusion that these provisions were not proven, as there is competent evidence to support the trial court's conclusion.

¶ 22 However, DCYF also invoked Section 2511(a)(8) in its petition to terminate Mother's parental rights. To satisfy this subsection, DCYF must show only (1) that the child has been removed from the care of the parent for at least twelve (12) months; (2) that the conditions which had led to the removal or placement of the child still exist; and (3) that termination of parental rights would best serve the needs and welfare of the child. 23 Pa.C.S.A. § 2511(a)(8). Notably, termination under Section 2511(a)(8), does *not* require an evaluation of Mother's willingness or ability to remedy the conditions that led to placement of her children. *S.H., supra,* 879 A.2d at 807; *In re J.T. and R.T.,* 817 A.2d 505, 509 (Pa.Super.2003).

¶ 23 *S.H.* is particularly instructive for the case *sub judice*. In *S.H.,* we affirmed a termination order under Section 2511(a)(8) when the evidence indicated that although S.H.'s parent was making progress, she would require another one or two years before conditions would be such that the return of her child to her custody could be contemplated. The parent in *S.H.* had argued on appeal that termination was improper because there was a reasonable possibility that she could remedy the conditions that had led to S.H.'s removal from her care. We determined that this argument was irrelevant under Section (a)(8), which requires only that the conditions continue to exist, not an evaluation of pa-

rental willingness or ability to remedy them. Noting that S.H. was eight-years old and had spent half of her life in the custody of the child welfare agency, we cited her need for permanence and stability in affirming the termination order under Subsection (a)(8).

¶ 24 It appears that the trial court has not appreciated fully the distinction between Sections 2511(a)(8) and (a)(5). Rather, the trial court improperly conflated the statutory requirements under Sections (a)(2), (a)(5), and (a)(8).[7] The trial court concluded that because Mother was making progress toward remedying the conditions that had led to removal of her children, her conduct did not satisfy the statutory requirements for termination under Subsection (a)(8). This conclusion constitutes an error of law.

■ ¶ 25 We next consider what conclusions we are permitted to draw concerning the specific elements of Subsection (a)(8), given our standard of review and based upon our review of the evidence of record and the trial court opinions. There is no question that the children had been removed from Mother's care more than twelve months prior to the filing of the termination petition on October 28, 2004. The record clearly shows that the children were removed from Mother's care, adjudicated dependent, and placed with their maternal grandmother in December 2001; subsequently, in February 2003, the children were placed in foster care. Thus, the children had been removed from Mother's care for nearly three years by the time DCYF filed the termination petition, satisfying the first element of Subsection (a)(8).

¶ 26 With respect to the second element, we conclude that the trial court implicitly acknowledged that the conditions that had led to the children's removal from Mother continued to exist. The children were adjudicated dependent due to lack of parental care and control. (Adjudication/Disposition Hearing Order, dated December 10, 2001, at 1). Following the termination hearing on April 5, 2005, the trial court concluded that Mother was making progress and might be able to remedy her situation at some time in the future; the trial court did *not* conclude that Mother's present situation was such that she could assume responsibility for the care and control of her children at the time of the hearing. (Trial Court Adjudication, dated May 16, 2005, at 5). The evidence of record strongly supports the conclusion that Mother remained unable to provide such care and control. Most relevant is Mother's own testimony at the termination hearing, excerpts of which follow:

Mother: ... I'm not asking you to put [the children] back in my house or anything. I just want to see them. I mean I have tried my best.

Counsel: You love your children?

Mother: Very much. And it's not easy choosing to give them up, but I know what is best for them. . . .

(N.T., 4/5/05, at 70; R.R. at 379a).

Mother: . . . . But I mean I know I got a lot of problems and it's not going to be dealed [sic] with in your time limit. It's not going to just happen overnight, as in

---

**7.** The trial court stated that Section 2511(a)(8), like Sections (a)(2) and (a)(5), addresses a "situation where a child has legitimately been removed from the parents and the parents cannot or will not remedy the situation that caused the removal." (Trial Court Adjudication, dated May 16, 2005, at

5). This statement does not accurately reflect the elements of Subsection (a)(8). Contrary to the trial court's implication, Subsection (a)(8) makes no mention of parental effort or ability to remedy, and inquiry into parental willingness or ability to remedy is not required. *See S.H., supra; J.T. and R.T., supra.*

your destination, [sic] how many years. *It's going to take years for me to get better.*[8]

(*Id.* at 72; R.R. at 381a) (emphasis added).

Counsel: And you said that [sic] before it would take a period of time for you to get to a point where you could have the kids live with you, correct?

Mother: Uh-huh.

Counsel: And do you have any idea how long that would be?

Mother: No.

(*Id.* at 74–75; R.R. at 383a–84a).

Counsel: And you currently feel that in your current circumstances, you could not handle them on a day-to-day basis. Is that correct?

Mother: (Witness nods head.)

(*Id.* at 87; R.R. at 397a).

¶ 27 Later in her testimony, Mother clarified that she wanted to be reunified with her children; however, she acknowledged that reunification was not possible at that point and could not be considered for at least a year. (*Id.* at 92–93; R.R. at 402a–03a).

¶ 28 These excerpts of Mother's testimony reflect her acknowledgement that, as of the date of the termination hearing, she remained unable to provide proper parental care and control of her children. No evidence was presented to the contrary. Testimony of a DCYF caseworker indicated that Mother had made little progress in addressing the issues that had led to removal and placement of her children. (N.T., 4/5/05, at 27; R.R. at 336a). Thus, the evidence of record compels the conclusion that the conditions that had led to the removal of the children continued to exist at the time of the termination hearing,

satisfying the second element of Subsection (a)(8).

¶ 29 We recognize that the application of Section (a)(8) may seem harsh when the parent has begun to make progress toward resolving the problems that had led to removal of her children. We also recognize that in a sense, the harshness may be amplified in the case *sub judice*, as Mother was only seventeen years of age when her first child was born. However, by allowing for termination when the conditions that led to removal of a child continue to exist after a year, the statute implicitly recognizes that a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future. Indeed, we work under statutory and case law that contemplates only a short period of time, to wit eighteen (18) months, in which to *complete* the process of either reunification or adoption for a child who has been placed in foster care. *See N.W., supra,* 859 A.2d at 508 (quoting *In re G.P.-R.,* 851 A.2d 967, 975–76 (Pa.Super.2004)).

¶ 30 The children in the case *sub judice* had been removed from Mother's care for more than three years and had been in foster care for more than two years at the time of the termination hearing. R.J.S. and J.S. were nine and eight years of age, respectively, at that time. Both were continuing to experience severe behavioral problems, for which they were receiving ongoing therapy. Their need for a permanent and stable family environment in which to grow up must now take precedence over Mother's claims of progress and increasing sense of responsibility.

---

8. Mother testified that she may suffer from bipolar disorder, although it is not clear from the record if she has ever been diagnosed with this disorder. (*Id.* at 88; R.R. 398a).

¶ 31 Finally, we turn to the third element of Section 2511(a)(8), which, like Section 2511(b), focuses not on the parent's conduct, but on the children and their needs. The court must consider the needs and welfare of the children, including the presence of any parent-child emotional bond, which encompasses intangibles such as love, comfort, security, and stability. *C.M.S., supra*, 884 A.2d at 1287. When an emotional bond is present between parent and child, the court must consider the effect of its permanent severance on the child. *Id.*; *In re R.L.T.M.*, 860 A.2d 190, 195 (Pa.Super.2004). Our Supreme Court has spoken in no uncertain terms about the importance of this consideration in a termination case: "To render a decision that termination serves the needs and welfare of the child without consideration of emotional bonds, in a case such as this where a bond, to some extent at least, obviously exists . . . is not proper." *In re E.M.*, 533 Pa. 115, 123, 620 A.2d 481, 485 (1993) (quoted in *In re C.W.S.M.*, 839 A.2d 398, 403 (Pa.Super.2003)). Consistent with our Supreme Court's directive, we have reversed and remanded termination cases in which the child welfare agency failed to present sufficient evidence concerning the presence or absence of a parent-child bond and the likely effect of its permanent cleavage on the child. *See In re C.W.S.M.*, 839 A.2d 398, 404–05 (Pa.Super.2003) (concluding that the record revealed a lack of evidence as to the effect of termination on the children, reversing the termination order, and remanding to allow the parties the opportunity to present testimony concerning the emotional bond between parent and children and the likely effect of its termination on the children); *A.C.H., supra* at 230 (same).

¶ 32 Our thorough review of the record in the case *sub judice* reveals that the parties presented almost no evidence directly relevant to the issue of emotional bonds, if any, between Mother and her sons. The possibility of a parent-child bond is indirectly suggested by certain excerpts of the testimony offered by DCYF. For example, at the hearing on March 31, 2004, DCYF foster care caseworker Ms. Katz testified that R.J.S. missed Mother and was angry with her. (N.T., 3/31/04, at 89–90; R.R. at 202a–03a). Testimony from Ms. Fried, another caseworker, revealed that R.J.S. was still asking about his mother at the time of the termination hearing. (N.T., 4/5/05, at 39; R.R. at 348a).

¶ 33 There was similar testimony concerning J.S. At the hearing on March 2, 2004, Ms. Rauenzahn, another foster care caseworker, testified as to a conversation that she had with J.S. when Mother was in Puerto Rico. J.S. was angry that Mother was gone and that he had not heard from her. He was angry that his foster parents, who happened also to be in Puerto Rico at the same time, had not taken him with them so that he could see Mother. He also said that he missed Mother's fiancé, whom he calls his dad, and wanted to see him. (N.T., 3/2/04, at 26; R.R. at 84a). Further, Ms. Rauenzahn engaged in the following dialogue with Mother's counsel:

> Counsel: Do the children know who mom is?
>
> Caseworker: They know who mom is.
>
> Counsel: And they have expressed a sadness over or do they express a desire to see her?
>
> Caseworker: The last time I spoke to [J.S.] about it, no, because he is so angry with her. He actually threw a fit and threw himself on the floor where he cried and said, "I hate my mom. I never want to see her again."

(*Id.* at 30; R.R. at 88a). Finally, with regard to J.S., Ms. Katz testified at the

hearing on March 31, 2004, that he had been "having some severe behavioral problems since the last court hearing when he found out his mother was back in town." (N.T., 3/31/04, at 64; R.R. at 177a).

¶ 34 These excerpts leave the unmistakable impression that there might be some kind of emotional bond between Mother and the children. However, despite these inferences, the presence or absence of a bond was not directly addressed in any way by the testimony of any witness for either party. Even more importantly, there was absolutely *no* testimony concerning the likely effect on the children of permanently severing any bond that might exist. Ms. Fried, the DCYF caseworker who testified at the termination hearing, merely offered her opinion that adoption would be in the best interests of the children, without reference to the bonding issue. (N.T., 4/5/05, at 25; R.R. at 334a). Even Mother's testimony failed to provide any insight as to her sense of her children's bond with her.[9] The trial court stated only that the children would "benefit" from being with Mother. (Trial Court Adjudication, dated May 16, 2005, at 6).

¶ 35 While no testimony was presented which addressed the presence or absence of an emotional bond between Mother and her children, DCYF caseworkers did present evidence as to the severe behavioral problems that both children continue to exhibit and for which they receive ongoing therapy.[10] When R.J.S. was first placed in foster care, he was out of control, exhibited night terrors, and was disrespectful to his

foster mother. These symptoms have improved, but he continues to receive medication for attention deficit hyperactivity disorder and to attend biweekly individual therapy. (N.T., 3/31/04, at 61–63, 90; R.R. at 174a–76a, 203a).

¶ 36 Other testimony indicated that J.S.'s behavioral problems are more severe. For example, Ms. Rauenzahn testified as follows when she was asked how J.S. was doing in foster care:

> [J.S.] is doing well, but he has many issues that we are having a lot of trouble working out with him. He has a lot of pent-up anger. Initially, when he was placed, he took absolutely no authority from female figures. He continues to be a very angry[ ] little boy.... He tears up things, throws out his toys, breaks things. He is a very angry[ ] young man.

(N.T., 3/2/04, at 20; R.R. at 78a). J.S. also exhibits other behavioral problems. For example, he urinated in a trash can, (*id.* at 25; R.R. at 83a), and he continues to hoard food, throw it away and then lie about it. (*Id.* at 22–23; R.R. at 80a–81a). Although such behavior is not unusual when a child first goes into foster care, the caseworker testified that she was concerned that the behavior had continued for so long. (*Id.* at 22; R.R. at 80a). J.S. is receiving treatment and additional evaluation from a therapist for these severe behavioral problems. (*Id.* at 20; R.R. at 78a).

¶ 37 This testimony makes clear that the children continue to exhibit troubling

9. The extent of Mother's contact with the children since their removal from her care is not entirely clear from the record. Her record of visitation with them appears to have been steady at times and very sporadic at other times. (*See, e.g.,* N.T., 3/31/04, at 88; R.R. at 201a). A DCYF caseworker testified that after some of these visits, the children returned to their foster homes hungry and filthy. (*Id.*

at 88–89; R.R. at 201a–02a). Several witnesses agreed that the maternal grandmother has consistently and regularly visited with the children, visits which the children anticipate and enjoy.

10. Ms. Katz did testify that R.J.S was "very, very bonded" with his foster parents. (N.T., 3/31/04, at 62; R.R. at 175a).

behavior patterns for which they are receiving ongoing needed therapy. In light of the testimony concerning the children's behavioral and psychological issues, it is particularly surprising that there was *no* exploration of how these issues might be influenced—for good or ill—by permanent cleavage of any emotional bond that they feel toward Mother. We emphasize that we are drawing absolutely no conclusion as to whether such an emotional bond exists or how its severance might affect the children. We simply hold that this is an issue that must be explored and addressed upon remand.

¶ 38 Although we have concluded, as detailed above, that DCYF did prove that Mother's conduct satisfied the statutory requirements of Section 2511(a)(8) for termination of parental rights, we also conclude that the evidence of record is insufficient to assess the possible emotional bonds between Mother and the children. Therefore, we vacate the trial court's order denying DCYF's petition to terminate Mother's parental rights and remand for further proceedings. The parties must be given the opportunity to present testimony concerning the possibility of an emotional bond between Mother and children and the likely effect on the children of permanently severing such a bond.

¶ 39 Based upon our careful review of the record, and for all of the reasons set forth above, we hold that the trial court did not err in terminating Father's parental rights, but did err in denying DCYF's petition to terminate Mother's parental rights in the absence of any assessment of the children's needs and welfare. Accordingly, we affirm the trial court's order terminating Father's parental rights; we vacate the denial of DCYF's petition to terminate Mother's parental rights; and we remand for further proceedings consistent with this opinion. We specifically direct that additional proceedings be held within sixty (60) days of the filing of this opinion.

¶ 40 Order affirmed in part and vacated in part. Case remanded with instructions. Jurisdiction relinquished.