J-S15001-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE:  ADOPTION OF J.C.T.R., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF:  A.L. | No. 1738 MDA 2014 |

Appeal from the Order Entered October 2, 2014
In the Court of Common Pleas of Tioga County
Orphans' Court at No(s): 43 O.C. 2014

BEFORE:  LAZARUS, J., WECHT, J., and JENKINS, J.

MEMORANDUM BY LAZARUS, J.:                    **FILED MARCH 27, 2015**

A.L. (Mother) appeals from the orphans' court's order, entered in the Court of Common Pleas of Tioga County, involuntarily terminating her parental rights to her minor son, J.C.T.R. (Child).  After careful review, we are constrained to reverse.

Child was born in Ohio in March 2009; at the time of Child's birth, biological Father lived in Pennsylvania.  Shortly after Child was born, Mother became addicted to pain killers and heroin.[1]  In August 2009, Mother was arrested for distributing drugs from her home and was placed on probation. In August 2012, Mother was arrested for violating her probation by testing

---

[1] Father testified that he was not aware of Child's birth until Child was seven months old.  However, Mother claims that she told Father about Child when she found out she was pregnant.  N.T. Termination Hearing, 10/1/14, at 213.

positive for drugs;[2] she was placed in a drug treatment facility for four months. Mother violated her probation by breaking rules at the treatment facility,[3] and, as a result, the court sentenced her in October 2012 to serve six months in prison. Maternal Grandmother, who also lived in Ohio, cared for Child during Mother's periods of drug treatment and incarceration.

In November 2012, Father filed an emergency custody petition while Mother was in prison; the petition was denied. In March 2013, Mother was released from prison and entered a halfway house. In April 2013, the Ohio court granted Father weekend visitation. Later that month, the Ohio court held a hearing and granted Father legal and physical custody of Child in Pennsylvania as of May 24, 2013.[4] The order also permitted Mother and her family to have companionship time with Child once Father assumed custody in Pennsylvania.

In August 2013, Father refused to allow Maternal Grandmother to "Skype" with Child. Thereafter, in September 2013, Maternal Grandmother filed a contempt petition against Father for his failure to comply with court-ordered companionship time. Mother testified that she waited until she was

---

[2] Child and Mother's three other children were living with her when she violated her probation for using drugs in August 2012. N.T. Termination Hearing, 10/1/14, at 182.

[3] Specifically, Mother told a fellow inmate why she had been placed at the facility, which was a violation of the rehabilitation center's rules.

[4] Father resides with Step-Mother in Tioga County.

released to the halfway house to contact Child in September 2013 because the prison would not accept collect calls from a cell phone without preauthorization. Once released to the halfway house, Mother called Father to speak to Child; Father refused to allow her to talk to Child on the phone, told her not to call again and further told her that she was harassing him. Father also told the staff at the halfway house about Mother's call and Mother was advised by the halfway house not to have any contact with Father until the contempt proceedings had concluded. Mother last saw Child in October 2012 and last spoke to Child on May 23, 2013.

After a hearing held in Ohio on October 22, 2013, the Ohio court denied Maternal Grandmother's contempt petition. The court noted that because there was an "ongoing criminal investigation,"[5] it suspended Mother and Maternal Grandmother's companionship time with Child until further order of court.[6]

---

[5] Although the order does not specify exactly what this investigation was about, the record bears out that there appeared to have been allegations of sexual and physical abuse perpetrated against Child, although the record is unclear as to who made the allegations and who the exact alleged abuser was.

[6] As of August 2014, the investigation into the alleged abuse had been suspended; the Ohio court transferred jurisdiction over the matter to Pennsylvania, finding that it is the home state of Child. The court also stated that "all issues of custody, companionship and support [are] properly before the Court of Common Pleas of Tioga County, Pennsylvania." Ohio Court Order, 8/1/14, at ¶13.

Maternal Grandmother sent letters to the court, monthly, letting the Ohio judge know that there was no actual investigation regarding any abuse of Child and requesting a new court date so that contact with Child could be resumed. Mother was ultimately released from the halfway house in January 2014.

Step-Mother, Father's wife, requested services for Child due to his emotional issues, constant temper tantrums, and sexualized behaviors that she believed stemmed from Mother and Mother's family. Behavioral specialist, Amanda Herr, began working with Child in August 2013; Herr testified at the hearing on October 1, 2014, that Child spoke about Mother using "crazy pills," that Mother hit and punched him and that Maternal Grandmother hit him with a belt. N.T. Termination Hearing, 10/1/14, at 8-9. Herr also testified that Father and Step-Mother were very proactive in securing counseling for Child and working with other organizations to improve Child's speech and support in school. Herr stated that Child would require intense counseling and services for "quite some time." *Id.* at 13. However, Herr acknowledged that any perspective she had on treating Child came solely from Father and Step-Mother, *id.* at 15, that she never had an opportunity to speak with Mother, and that Child had never specifically named anyone as his abuser, including Mother and her family. *Id.* at 26.

Family therapist, Laura Knowlton, testified that she has been working with Child since August 2014, providing support to Father and Step-Mother's family so that they could become more functional. She was asked to take

over services due to Child's behavioral regression and need for a more intensive program. She testified that while she has been working with Child he has never spoken about Mother or her Ohio family, *id.* at 33, and that anything she has learned about Mother and her family has come from Father and Step-Mother. *Id.* at 41.

On April 30, 2014, Father[7] filed the instant petition seeking involuntary termination of Mother's parental rights.[8] On October 1, 2014, the court held a hearing on the petition; on October 2, 2014, the court announced its decision, to terminate Mother's rights pursuant to 23 Pa.C.S. §§ 2511(a)(1) and (b), in open court. On appeal, Mother presents the following issues for our consideration:

> (1)　Did the trial court abuse its discretion when it determined that Mother has shown that she wants to relinquish her parental rights or has failed to perform her parental duties?
>
> (2)　Did the trial court abuse its discretion in determining that the best interest of the child would be served by terminating the Mother's parental rights?

Mother first contends that the court improperly determined that her parental rights should be terminated pursuant to section 2511(a)(1).

---

[7] *See* 23 Pa.C.S. § 2512(a)(1) ("A petition to terminate parental rights with respect to a child under the age of 18 years may be filed by . . . [e]ither parent when termination is sought with respect to the other parent.").

[8] In July 2014, the Ohio court issued an order clarifying the fact that Mother "did not voluntarily give up [her] right to have companionship and contact with child," and transferred jurisdiction of the parties' matter to Pennsylvania.

Specifically, she claims that because she was precluded by an Ohio court order from contacting Child for months preceding the filing of the termination petition, and that she had taken the only actions available to her to attempt to foster a relationship with Child during the relevant periods; it was, therefore, not proven by clear and convincing evidence that she "either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties." 23 Pa.C.S. § 2511(a)(1).

> In a proceeding to terminate parental rights involuntarily, the burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so. The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." It is well established that a court must examine the individual circumstances of each and every case and consider all explanations offered by the parent to determine if the evidence in light of the totality of the circumstances clearly warrants termination.

*In re adoption of S.M.*, 816 A.2d 1117, 1122 (Pa. Super. 2003) (citation omitted). Moreover, we review a trial court's decision to involuntarily terminate parental rights for an abuse of discretion or error of law. *In re A.R.*, 837 A.2d 560, 563 (Pa. Super. 2003). Our scope of review is limited to determining whether the trial court's order is supported by competent evidence. *Id.*

Instantly, the trial court terminated Mother's parental rights pursuant to section 2511(a)(1) of the Adoption Act.[9]  Section 2511(a)(1) sets forth the following grounds for involuntary termination:

> (a)  General rule. --The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> > (1) The parent by conduct continuing **for a period of at least six months** immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

23 Pa.C.S. § 2511(a)(1) (emphasis added).  When considering section 2511(a)(1) in a termination matter, the court should consider the entire background of the case and not simply:

> mechanically apply the six-month statutory provision.  The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of h[er] . . . parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

*In re Z.P.*, 994 A.2d 1108, 1117 (Pa. Super. 2010) (citing *In re D.J.S.*, 737 A.2d 283, 286 (Pa. Super. 1999)).  Additionally, we note that a parent's responsibilities are not tolled during incarceration.  *In re B.,N.M.*, 856 A.2d 847, 855-56 (Pa. Super. 2004).  Rather, "[a]n incarcerated parent is expected to utilize all available resources to foster a continuing close relationship with h[er] . . .  children.  The focus is on whether the parent

---

[9]  23 Pa.C.S. §§ 2101-2938.

utilized resources available while in prison to maintain a relationship with h[er] . . . child." *Id.*

In *In re R.J.S.*, 901 A.2d 502 (Pa. Super. 2006), an incarcerated Father similarly argued that a custody order barred him from any contact with his children and that his numerous efforts to modify the no-contact order were unsuccessful. Our Court noted that "the record contains *no* evidence, other than Father's testimony, that he took *any* concrete steps to modify the custody order or that he was rebuffed by the court. To the contrary, the evidence suggests that Father did not pursue the avenues that were open to him for assistance through DCYF." *Id.* at 508-509 (emphasis in original). Father in *R.J.S.* was not only assigned a caseworker, who "identified what he needed to do to get the family court order modified," *id.* at 509, but was also given constant updates on his children and sent copies of his family service plan by the caseworker without any prompting on his part. *Id.* In response, Father never took the caseworker's suggestions to modify the order, failed to respond to a single letter or request by the caseworker, and never tried to contact the agency relative to his children. *Id.*

Here, unlike the Father in *R.J.S.*, Mother was not offered any assistance with regard to the no-contact order from a local department of children and youth services. Instantly, Mother testified that from August 2012 (when she was in the drug treatment facility and in jail) to May 2013 (when Father obtained custody of Child), she called Maternal Grandmother

one to two times a day and talked to Child. Additionally, Mother attempted to call Child in September 2013 when she was at the halfway house; however, Father told Mother that she could not speak to Child, that she was harassing him and that she was not to call him anymore. Moreover, when Father reported the call to authorities at the halfway house, Mother was instructed not to call Father anymore. N.T. Termination Hearing, 10/1/14, at 241.[10]

From May 2013 (when Father had custody of Child) through October 2013 (date of no companionship/contact order), Mother testified that she called Maternal Grandmother consistently to get updates on Child. Because Father and halfway house personnel told Mother not to call Child, her best chances at finding out about Child was through her mother. After the October 2013 Ohio order precluded Mother and Maternal Grandmother from contacting Child, Maternal Grandmother attempted, on behalf of Mother who was still in a halfway house, to have the no-companionship order modified so that she could resume her visitation with Child. *Id.* at 168. After recovering from a heart attack in March, Maternal Grandmother continued to attempt to have the court order modified. *Id.* at 169. Finally, following Mother's release from the halfway house in January 2014, Mother, herself, tried to have the order modified. *Id.*

_____

[10] Father does not contest this testimony.

In **In re J.F.**, 572 A.2d 223 (Pa. Super. 1990), a father similarly filed a petition to terminate natural mother's parental rights to their child. When child was nine months old, mother had relinquished physical custody to father and his parents, but still maintained contact with child. Father ultimately married his current wife; however, child continued to reside with paternal grandparents. Ultimately, legal custody was awarded to father with liberal visitation to mother and paternal grandparents. In father's petition to terminate mother's rights, father claimed that mother had relinquished her parental rights for at least six months, under section 2511(a)(1). The court ultimately found that mother could have done much more to demonstrate a place of importance in child's life, and that mother had failed to perform parental duties for at least three years or take reasonable, affirmative action to maintain communication and a relationship with child. Specifically, the court found that even though father had made it difficult for mother to contact child, mother had not visited with daughter despite being granted visitation rights and had never attempted legal action to enforce her visitation rights.

Here, in contrast to the mother in **In re J.F.**, Mother was faced with insurmountable obstacles that were exacerbated by her incarceration. To overcome these obstacles partially put in place by Father, the halfway house, and the court in Ohio, Mother employed the help of Maternal Grandmother to keep her updated on Child's well-being and have letters and motions filed with the Ohio court in her stead. Under the circumstances, we

find that these attempts were not only reasonable, but the most feasible way to regain contact with Child upon her release from the rehabilitation center, prison, and the halfway house. *See B.,N.M.*, *supra* at 855 (a court "must consider situations in which a custodial parent has deliberately created obstacles and . . . erected barriers intended to impede free communication and regular association between noncustodial parent and h[er] child.").

We do not overlook or diminish the fact that Mother's imprisonment, which was a direct result of her drug addiction/dependency and selling drugs from her home, was the main reason that Child was removed from her care. However, while Mother will admittedly be challenged in parenting Child as she has not actively parented him for the past two years of his life, the statute does not permit the trial court to terminate her rights under section 2511(a)(1) on such a presumption. *Cf. In re C.L.G.*, 956 A.2d 999 (Pa. Super. 2008) (where Mother was incarcerated for drug-related crimes, underlying drug issues precluded her from properly parenting Child and supported termination under section 2511(a)). At the termination hearing, Mother offered evidence showing that she has been drug-free since August 2012. She also testified that she is currently employed as a waitress at a local pub/sports restaurant.

By the same token, we cannot ignore the fact that Child lived with and was cared for by Mother for the first three-and-a-half years of his life. Despite the fact that Mother was a drug addict, she enrolled child in pre-school during that time, kept him up to date on his doctor's appointments,

had him enrolled in an early intervention program for his behavioral issues, and had Maternal Grandmother take care of him while she was in prison.[11]

> In **In re Shives**, 525 A.2d 801 (Pa. Super. 1987), our Court stated: Only where the totality of the circumstances demonstrates **clearly and convincingly** that a parent has refused or failed to perform parental duties for a minimum period of six months may an order be entered terminating parental rights. The pertinent inquiry is not the degree of success a parent may have had in reaching the child, but **whether, under the circumstances, the parent has utilized all available resources to preserve the parent-child relationship.**

*Id.* at 803 (emphasis added). Based on a careful and comprehensive review of the record in this case, we are forced to conclude that the evidence did not clearly and convincingly demonstrate that Mother refused or failed to perform her parental duties for six months. Mother's incarceration, coupled with Father's refusal to allow her to communicate with child as well as an out-of-state no-contact order, amounted to overwhelming barriers that prevented her from utilizing traditional methods of communication to demonstrate her continued interest in maintaining a parental relationship with Child. By using her mother to update her on Child's well-being and to file court papers and letters requesting modification of the no-contact order, Mother's actions in this case amounted to diligent attempts to preserve the parent-child relationship *under the circumstances and means available to her*. **See In re J.G.J., Jr.**, 532 A.2d 1218, 1220 (1987) ("In Pennsylvania,

---

[11] We note that Father was not in the picture at all until he filed for custody in November 2012.

courts applying this standard have required that the evidence be so clear, direct, weighty, and convincing as to enable the factfinder to come to a clear conviction without hesitancy, of the truth of the precise facts in issue.").

Recognizing that we are limited, on appeal, to determining whether the court's order is supported by competent evidence and that we review a trial court's decision to terminate a parent's rights for an abuse of discretion or error of law, we must reverse.[12] Under the totality of the circumstances, **Z.P.**, **supra**, we find that termination was not warranted under section 2511(a)(1).[13]

Having found that Father did not prove, by clear and convincing evidence, that Mother's rights should be terminated under section 2511(a),

---

[12] The trial court also bases its decision to terminate under section 2511(a)(1), in part, on the fact that Mother never sent the Child letters, pictures or gifts. Trial Court Opinion, 11/10/14, at 1. However, Mother explained that she was not permitted to send presents from prison and, that based on Father's prior actions refusing her contact with Child, she reasonably believed that anything she would send Child would not be given to him. Moreover, if she was under court order to not contact Child, any such attempted gifts or communication would be a direct violation of the court, subjecting her to sanctions or further loss of her rights to see Child.

[13] We recognize that Mother testified that she does not want to take Child away from Father and Step-Mother, but just wants to be back in her Child's life. She seeks visitation with him, although acknowledging that it will be a gradual process requiring supervision at first. In sum, she does not want to disrupt Child's life in Pennsylvania with the family he has been living with for the past two and one-half years. N.T. Termination Hearing, 10/1/14, at 250-51. Moreover, Step-Mother testified that she and Mother had, for the most part, a relatively cordial relationship and that she "absolutely believe[s] that [they] can . . . as two sets of parents[,] that we can co-parent with Child." **Id.** at 138.

we do not address Mother's second issue related to the court's determination under section 2511(b). ***See In re C.L.G.***, 956 A.2d 999 (Pa. Super. 2008) (only after determining parent's conduct warrants termination of parental rights under section 2511(a), may court engage in second part of analysis under section 2511(b)).[14] While it may be tempting to look at the best interests of the Child and bootstrap the section 2511(a) arguments and conclusions, the statute does not permit a court to engage in such an analysis.

_____

[14] However, even if we concluded that termination was proper under section 2511(a), we disagree with the court's determination that the best interests of Child were served by terminating Mother's parental rights under section 2511(b). Here, the court concluded that the impact in severing any potential parent-child bond "would be outweighed by the potential harm of the child in the resumption of contact *at this time*." N.T. Termination Hearing, 10/2/14, at 325-26 (emphasis added). As a result, the court concluded that terminating Mother's rights to Child would be in his best interests under section 2511(b). However, the court's focus in this regard is short-sighted; it must assess the *permanent* effect that severing any parent-child bond would have on Child. Here, there was no testimony from any witness directly addressing the presence or absence of any bond between Mother and Child. In fact, behavioral specialist, Amanda Herr, testified that it would be "difficult" for her to say whether Child had a familiar bond with Mother and her family. N.T. Termination Hearing, 10/1/14, at 11. While neither a formal bond evaluation nor an expert opinion is required for a section 2511(b) analysis, at a minimum the court must consider the presence of any parent-child emotional bond and the effect that severance would have on the child. ***In re C.M.S.***, 884 A.2d 1284, 1287 (Pa. Super. 2005). Interestingly, the trial court even questioned Ms. Herr's qualification to make a recommendation to terminate Mother's rights. ***See*** N.T. Termination Hearing, 10/1/14, at 305. Moreover, it is inappropriate to even discuss this issue unless and until section 2511(a) is proven by clear and convincing evidence.

Order reversed.[15]  Jurisdiction relinquished.

Judgment Entered.

*[signature]*

Joseph D. Seletyn, Esq.
Prothonotary


Date: 3/27/2015

---

[15] We express no opinion with regard to whether an emotional bond exists such that its severance would not be in Child's best interest.  This is something that must be further explored by the trial court should a new petition to terminate Mother's rights be filed.