**In re N.W., Minor Child.**

**Appeal of P.L., Natural Mother.**

Superior Court of Pennsylvania.

Submitted July 6, 2004.
Filed Sept. 21, 2004.

Theodore A. Morris, Williamsport, for P.L., appellant.

John A. Felix, Williamsport, for W., Father, K., appellee.

Eric R. Linhardt, Williamsport, Guardian Ad Litem, for appellee.

Charles F. Greevy III, Williamsport, for Lycoming Children and Youth, appellee.

Before: KLEIN, GANTMAN and TAMILIA, JJ.

TAMILIA, J.:

¶ 1 Mother appeals the October 31, 2003 Order terminating her rights to her son N.W., born October 5, 2000. Upon a thorough review of the record, mother's arguments, and the applicable law, we affirm.

¶ 2 Lycoming Children and Youth Services (LCYS) filed a petition for involuntary termination of parental rights of both mother and father. Following a September 22 and 23, 2003 hearing on the petition, the court made the following findings of fact relevant to mother:

1. [N.W.] (hereinafter referred to as child) is a male child, born October 5, 2000 to his biological mother, [P.L.] (hereinafter referred to as mother) and his biological father, [K.W.] (hereinafter referred to as father).

. . .

3. The case originally came to the attention of the agency on December 12, 2001 when the child's daycare facility contacted the agency indicating that no one had picked up the child.

4. Lisa Washington, proprietor of the Child Guidance Daycare Center testified that the child was to be picked up by his grandmother between 2:30 and 3:30 p.m. At 8:30 p.m. they became concerned about the disposition of the child and contacted the agency. Later that evening, placement of the child into emergency custody through the agency was authorized by the Honorable Clinton W. Smith.

5. In the ensuing days it was learned that the child's mother had been incarcerated at the Columbia County Prison awaiting extradition to Philadelphia to answer two bench warrants. Upon being incarcerated, mother had made arrangements with her mother, [M.L.] (hereinafter referred to as grandmother) to provide care for the child until her release and it was the grandmother that had taken the child to the childcare center on December 12, 2001.

6. Testimony elicited from the grandmother disclosed that as a result of a severe cocaine habit, she did not retrieve the child from the daycare center on December 12, 2001. The agency attempted to locate other resources including father, however, father was incarcerated in December 2001 in the Lycoming County Prison.

7. At the request of the child's family, and with agreement of father, the child was placed with a family friend, Kirdira Smith.

8. On January 7, 2002, the child was adjudicated dependent and he was placed in the care of Kirdira Smith under protective services provided by the agency. Shortly after the placement of the child with Ms. Smith, she informed the agency that

she would be unable to continue to care for the child. Accordingly, the child was transferred to agency foster care on January 17, 2002.

. . .

10. Following her release in Philadelphia, mother returned to Lycoming County. Although the child was in foster care, the case was under the supervision of the reunification unit of the agency as of January 21, 2002.

11. The agency continued to have concerns regarding mother in that she was involved with a paramour, Lionel Harris, who had come to the attention of the agency as a perpetrator of child abuse during this period of time. Although mother provided other possible resources for the child, upon investigation these resources were unacceptable to the agency.

12. As part of the reunification plan developed by the agency, mother was scheduled for a psychological evaluation on June 27, 2002; she did not appear for the evaluation.

13. The Court held a permanency hearing on July 1, 2002 at which time a program was developed for mother to reassume custody of the child. Included in the service plan were the psychological evaluation and a drug and alcohol evaluation. As of the time of this hearing, September 22 and 23, 2003, mother never undertook having the psychological evaluation conducted nor did she have the drug and alcohol evaluation, although at the hearing she presented a letter that indicated she had recently made contact with the drug and alcohol evaluator. Other psychological evaluations were scheduled for mother, however, she did not appear for those including one scheduled July 22, 2002. In addition to the foregoing, as part of the permanency plan, mother was referred to parenting classes, however, to date she has not attended any of those classes.

14. Mother continues to have difficulties with the criminal court system. She missed a court hearing scheduled on February 6, 2002 and apparently was incarcerated as a result of a bench warrant with regard to that incident. It should be noted, however, that she was released by the first week of March, 2002.

15. Mother has been unsuccessful in staying employed. Of several jobs she reported, none of them lasted more than a few months.

16. Mother has had difficulty maintaining residences. She has been evicted or otherwise moved from six different residences in Lycoming County and Philadelphia during the time the child has been in foster care. Currently, she is residing in Williamsport with her mother.

17. The Court does find that mother has attended a number of visits with the child but she has also missed quite a few visits.

18. In the light most favorable to mother, many of her missed visits have been as a result of difficulty with transportation from Philadelphia. Purportedly, her only available transportation is a bus and the Court notes that the bus ride to and from Philadelphia is approximately six (6) hours in each direction. Since she has returned to Williamsport in March, 2003 her visits have been somewhat more regular. In July, 2003, mother informed the agency that she was pregnant and homeless but was staying with her mother, [M.L.] for the time being. Since the child entered fos-

ter care on July 17, 2002,[1] mother has visited a total of approximately nine (9) hours. This is over a span of 20 months.

. . .

20. The foster mother, Wendy Solomon testified that the child is doing well in foster care. The child verbalizes well and is a typical three year old with no medical problems. Ms. Solomon further testified that in her opinion, although the child recognizes his mother, he has no bonded relationship with her.

. . .

Trial Court Opinion, Anderson, J., 10/31/03, 1–4.[2]

¶ 3 The court found termination was justified based upon 23 Pa.C.S.A. § 2511, **Grounds for involuntary termination,** (a) **General Rule,** (5), which provides that the rights of a parent with regard to a child may be terminated if:

[t]he child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

*Id.* The court found the requirements of this section were satisfied with respect to mother by clear and convincing evidence, concluding:

It is unforgivable that the mother would allow her child to languish in foster care for a period of 20 months and not take any substantial steps toward remedying the condition that led her child to be placed in the first instance. Although the agency provided her with a roadmap, a very reasonable roadmap, to reunification, mother took no affirmative action of her own. Although the agency scheduled for her the psychological evaluations, she did not attend. Although the agency gave her the name, address and phone number of the drug and alcohol evaluator, she made no attempt to meet that requirement. Although the agency made it convenient for her to attend parenting classes, mother made little or no effort in this regard. Further, the Court is unconvinced that mother will suddenly and miraculously redirect her life with a priority towards establishing a stable home or even a stable employment situation with the best interest of the child in mind.

Mother's situation today is no better than when the child was removed in December 2001. Mother did not report any type of employment, did not report any type of stable housing, did not report any type of capacity to take care of the child other than her desire to now get serious about the matter in view of the termination proceedings. In the interim, the child has spent two of his most formative years in foster care and

---

**1.** It appears the date of "July 17, 2002" in finding of fact # 18 is a typographical error since finding of fact # 8 above indicates the child was transferred to foster care on January 17, 2002 rather than July 17, 2002. Also, from January 2002 to September 2003, the time of the hearing on the termination peti-

tion, is a span of 20 months, which is the amount of time indicated in finding of fact # 18.

**2.** We have paraphrased some of these findings to make them more succinct.

appears to be flourishing in that environment.

Should the agency's Petition be denied, the child would be placed in a situation where his permanency would be delayed for untold months while mother perhaps began meeting some of the modest requests of the agency. The child deserves better and his best interests and welfare [are] served by the termination of parental rights by this Court.

Trial Court Opinion, Anderson, J., 10/31/03, at 6. For the same reasons articulated above, the trial court concluded mother's rights should also be terminated pursuant to 23 Pa.C.S.A. § 2511(a)(2)[3] and (a)(8).[4]

¶ 4 Mother appeals from the court's October 31, 2003 Order, raising the following allegations of error:

1. Is there reversible error when the trial court capriciously disregards the fact that the goal in the juvenile court is still reunification but the agency was proceeding to orphan's court to terminate the appellant's parental rights without first getting the juvenile court's approval of a goal change?

2. Was the decision of the trial court that it was in the best interest of the child to terminate appellant's parental [rights] not supported by competent evidence where the sole testimony pertaining to the child was from a foster parent whose intentions were to adopt?

3. Did the trial court error [sic] and capriciously disregard evidence that would have shown that there was [sic] insufficient grounds to terminate the appellants [sic] parental rights?

Appellant's brief at 4.[5]

¶ 5 We begin by noting the following well-established legal principles.

> In a proceeding to involuntarily terminate parental rights, the burden of proof is upon the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so.

*In re Adoption of T.B.B.*, 835 A.2d 387, 394 (Pa.Super.2003) (citation omitted).

> When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the deci-

---

**3.** 23 Pa.C.S.A. § 2511, **Grounds for involuntary termination**, (a) **General Rule**, (2), provides that the rights of a parent in regard to a child may be terminated if:
> [t]he repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental wellbeing and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

**4.** 23 Pa.C.S.A. § 2511, **Grounds for involuntary termination**, (a) **General Rule**, (8), provides that the rights of a parent in regard to a child may be terminated if:
> [t]he child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

**5.** We note appellant's brief is muddled and replete with misspellings and handwritten corrections. The first sentence in his "statement of the case" is illogical. It also appears counsel copied his brief from *In re M.G.*, 855 A.2d 68, 2004 Pa.Super. Lexis 1541 (2004), but failed to remove arguments as to his first issue in that case regarding a home study. *See* Appellant's brief at 12. We strongly advise that counsel proofread his briefs before submitting them to this Court.

sion of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that it would give to a jury verdict. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re B.L.W.*, 843 A.2d 380, 383 (Pa.Super.2004) (citations omitted). If competent evidence supports the court's findings, we will affirm even if the record could also support the opposite result. *In re Adoption of T.B.B.*, at 394.

■ ¶ 6 In a termination proceeding, the focus is on the conduct of the parents. *In re B.L.W.* at 383. Paramount, however, is that adequate consideration be given to the needs and welfare of the child. *In re J.I.R.*, 808 A.2d 934, 937 (Pa.Super.2002), *appeal denied,* 573 Pa. 672, 821 A.2d 587 (2003); *see also* 23 Pa.C.S.A. § 2511(b) **Other considerations.**

■ ¶ 7 As to mother's first contention, that the trial court erred in allowing LCYS to proceed with its petition for termination before it sought and obtained a goal change from reunification to adoption in juvenile court, the same issue was raised by counsel in the case of *In re M.G.*, 855 A.2d 68, 2004 Pa.Super. Lexis 1541 (July 1, 2004, amended July 12, 2004). In *M.G.* this Court held that a goal change from reunification to adoption was *not* a neces-

sary prerequisite to the initiation of involuntary termination proceedings. Although *M.G.* is on point, some factual differences between that case and this one require us to delve into some of appellant's arguments on this issue that were raised in both cases.

¶ 8 In *M.G.*, this Court found no express provision in either the Adoption Act, 23 Pa.C.S.A. § 2101, *et seq.*, or in the Juvenile Act, 42 Pa.C.S.A. § 6301, *et seq.*, required a termination petition to be preceded by a goal change petition. *M.G.* at 71–72, 2004 Pa.Super. Lexis at \*\*7. We noted the Juvenile Act provides that the court, at a permanency hearing where the ostensible goal is reunification and the child has been in placement for an extended period, shall determine whether the social service agency has filed a termination petition. The statute specifically provides:

At each hearing, the court *shall*

. . .

(9) if the child has been in placement for at least 15 of the last 22 months or the court has determined that aggravated circumstances exist and that reasonable efforts to prevent or eliminate the need to remove the child from the child's parent, guardian or custodian or to preserve and reunify the family need not be made or continue to be made, determine whether the county agency has filed or sought to join a petition to terminate parental rights and to identify, recruit, process and approve a qualified family to adopt the child[.]

42 Pa.C.S.A. § 6351(f)(9) (emphasis supplied).[6] As the statute *requires* the court

---

6. In *M.G.* this Court stated:

a plain reading of the Juvenile Act suggests that one of the matters that *may* be determined at a six-month permanency hearing where the ostensible goal is reunification but the child has been in placement for an

extended period, is whether the social service agency has filed a termination petition. *M.G.*, at 71–72, 2004 Pa.Super. Lexis 1541, \*\*7 (emphasis supplied). We note here that the plain language of the statute as set forth

to make this inquiry *if the child has been in foster care for 15 of the last 22 months,* clearly the legislature anticipates that the county agency would have filed a termination petition *by that time.*

¶ 9 In *M.G.,* the daughter, J.G., was placed in foster care in January 2002. At a March 2003 six-month permanency hearing, while the permanency goal remained reunification, it was determined the only compelling reason why a termination petition had not been filed was that the child had "only" been in foster care for thirteen consecutive months. *M.G.,* at 72, 2004 Pa.Super. Lexis at **8. Soon thereafter, in June 2003, after J.G. had been in foster care for sixteen consecutive months, the agency filed the petition. *Id.*

¶ 10 Here, N.W. has been in foster care since January 17, 2002.[7] The petition for involuntary termination was filed March 24, 2003, at which time N.W. had been in foster care continuously for more than 14 months, and remained there as of the September 2003 termination hearing. LCYS was clearly doing what the legislature expected it and intended it to do when it filed the involuntary termination petition *by the time* the child was in foster care for 15 of the prior 22 months.

¶ 11 It is also important to note the impact of the passage of the **Adoption and Safe Families Act** (ASFA), 42 U.S.C. § 671 *et seq.,* pursuant to which Pennsylvania amended the Juvenile Act. To address the issue of foster home drift, the ASFA has made a commitment to, and

Pennsylvania statutes mandate, permanency planning such that,

when a child is placed in foster care, after reasonable efforts have been made to establish the biological relationship, the needs and welfare of the child require CYS and foster care institutions to work toward termination of parental rights, placing the child with adoptive parents. *It is contemplated this process realistically should be completed within 18 months.*

*In re G.P.-R.,* 851 A.2d 967, 976, (Pa.Super.2004), *citing In re B.L.L.,* 787 A.2d 1007, 1016 (Pa.Super.2001) (emphasis supplied). As the entire process is expected to be completed *within 18 months,* LCYS was not acting capriciously in filing the termination petition where N.W. already had been in foster care for nearly 15 months.

¶ 12 As in *M.G.,* appellant here appears to argue the Orphans' Court usurped the exclusive jurisdiction of the Juvenile Court when it considered the termination petition where the goal remained reunification. In *M.G.,* we noted that both the Orphans' Court and the Juvenile Court are divisions of the Court of Common Pleas and that, "as a practical matter, goal change petitions and termination petitions often 'go to the same trial judge.'" *Id.,* at 73, 2004 Pa.Super. Lexis at **10, *citing In re H.S.W.C.-B,* 575 Pa. 473, 477, 836 A.2d 908, 910 (2003). Further, in *M.G.,* the same judge did, in fact, approve the March 2003 permanency Order setting forth the continuing reunification goal, and sat as

*supra* is mandatory and *requires* the court to make that determination.

**7.** At the six-month permanency hearing held on July 1, 2002, the record indicates a plan of reunification was discussed. Another permanency hearing should have been held in approximately January–February 2003. *See* 42 Pa.C.S.A. § 6351, **Disposition of Dependent**

**Child,** (e) **Permanency hearings,** (3)(i), which provides "the court shall conduct permanency hearings ... within 6 months of each previous permanency hearing until the child is returned home or removed from the jurisdiction of the court." Although it appears from the record that no other permanency hearing was held, no party has raised this issue.

fact-finder at the termination proceedings. This Court, therefore, concluded:

> given the statutory framework which sets forth an interplay in permanency goals between reunification on the one hand and adoption on the other, and the fact that President Judge Smith sat as both the Juvenile Court and the Orphan's Court in this matter, that there was no usurpation of jurisdiction by one court over the other[.]

*M.G.,* at 73, 2004 Pa.Super. Lexis at **11. Like *M.G.,* this case was adjudicated in the Lycoming County Court of Common Pleas. Here, however, we have no indication from the record whether Judge Dudley N. Anderson, who presided over the September 22 and 23, 2003 termination hearing and entered the October 31, 2003 Opinion and Decree, also presided over the July 2002 permanency hearing. We conclude, nevertheless, that there has been no usurpation of jurisdiction here.

¶ 13 This case is not *In re A.L.D.,* 797 A.2d 326 (Pa.Super.2002) in which the Juvenile Court entered an Order specifically approving the goal change to adoption, which we affirmed on appeal, and subsequently the Orphans' Court denied a petition for involuntary termination and exceeded its jurisdiction by ordering a renewed effort at reunification. Nor is it *In re J.A.S.,* 820 A.2d 774 (Pa.Super.2003), in which the Juvenile Court entered an Order changing the goal to adoption and the Orphans' Court exceeded its jurisdiction in attempting to re-open the issue of whether the family service plan could be adjusted to better meet the needs of the family. As we stated in *J.A.S.:*

> As a practical and legal matter, an order by the juvenile court changing the child's placement goal from reunification to adoption **ends any dispute that may exist between CYS and the parent as to the adequacy of CYS' services aimed at reuniting the parent with his/her children and, of course, as to whether CYS had selected the most appropriate goal for this family.** By allowing CYS to change its goal to adoption, the trial court has decided that CYS has provided adequate services to the parent but that he/she is nonetheless incapable of caring for the child and that, therefore, adoption is now the favored disposition. **In other words, the trial court order is the decision that allows CYS to give up on the parent.**

*Id.,* at 781 (citation omitted, emphasis in original).

¶ 14 This was not a case where the Juvenile Court had made a *conclusive* determination that adoption was the goal, allowing CYS to "give up on the parent," and the Orphans' Court attempted to overturn that decision. Rather, the court had made an initial determination in July 2002 that the plan was reunification. No further action was taken in Juvenile Court. In March 2003, after N.W. had been in foster care for almost 15 months, LCYS filed a termination petition in Orphans' Court. In other words, the goal had remained static and the child had been in foster care for an extended period but reasonable efforts had failed to produce any progress toward unification during that time. Under these circumstances, and because, as we concluded in *M.G.,* nothing in the statutory scheme requires that a goal change petition precede a termination petition, we find the Orphans' Court did not usurp the Juvenile Court's jurisdiction in terminating mother's parental rights.

¶ 15 Here, as in *M.G.,* appellant relies upon *In Interest of Patricia S.,* 326 Pa.Super. 434, 474 A.2d 318 (1984) in which, after the Juvenile Court granted father's petition seeking reunification and granted

him visitation with daughter, and only weeks before the contemplated goal of reunification was to be achieved, the prospective adoptive mother filed a petition for adoption in Orphans' Court. She also sought from the Juvenile Court a stay of that Court's reunification Order pending outcome of the adoption proceedings. The Juvenile Court denied relief and we affirmed, concluding that to hold otherwise would damage the operation of the Juvenile Court and the law it administers by allowing such an attempt to derail ongoing proceedings in that Court. In *M.G.* we found no evidence that the agency's petition to terminate mother's parental rights was an attempt to derail ongoing Juvenile Court proceedings or reunification planning. We further found the record was replete with competent evidence to support the court's decision to terminate parental rights. We find likewise here.

¶ 16 As in *M.G.*, appellant cites no authority in her meager argument that there were insufficient grounds to terminate her parental rights and her argument spans barely more than one page of her brief. Her arguments, moreover, are difficult to decipher. She intermittently complains that LCYS petitioned to terminate her rights while the goal remained reunification. We already have disposed of that argument. Among her remaining arguments, she contends that she placed the child in the care of a person who then placed the child in the maternal grandmother's care, and it was grandmother who abandoned the child at daycare. As the trial court indicated, while the reason for N.W.'s initial involvement was the caretaker's failure to pick up the child, the reasons for his placement were varied and unrelated to that incident. Trial Court Opinion, Anderson, J., 2/5/04, at 3.[8]

¶ 17 Incredibly, mother also complains the agency never offered to find her housing or employment and, if a court Order requires her to have housing or employment, then LCYS must offer her housing and employment programs; otherwise, she says, the requirement is an obstacle for her. Mother cites no authority that LCYS is obligated to do so. Significantly, testimony indicates LCYS did not provide her with job referrals because she repeatedly told the agency she had a job. N.T., 9/22/03, at 103. Moreover, we remind mother that LCYS scheduled psychological evaluations which she failed to attend, gave her the name and address of the drug and alcohol evaluator, but she made no attempt to fulfill that requirement, and made it convenient for her to attend parenting classes, which she made little or no effort to do. *See* N.T., 9/22/03, at 82.

¶ 18 Mother further complains LCYS failed to act upon her request to have N.W. placed in a foster setting closer to Philadelphia, where she lived intermittently. Again, she cites no authority for her contention. Furthermore, we note that in the more than 20 months that N.W. was in foster care, mother was unable to establish and maintain a residence. N.T., 9/23/03, at 82. Testimony, including mother's own, indicates that for almost all of 2002, she moved to and from Philadelphia. N.T., 9/22/03, at 80; N.T., 9/23/03, at 46. She said she would "stay up here [Lycoming County] for a little while, then go back to Philadelphia." N.T., 9/23/03, at 46. It seems she expected LCYS to arrange for N.W. to be transferred based upon her whims. In sum, mother seems to blame anyone and everyone for her failure to perform her parental duties. We remind mother that in termination proceedings the focus is on the conduct of the parents. *In*

8. In the record the Opinion, filed in response to appellant's statement of matters complained of on appeal, is dated "2/4/04," but stamped as being filed "February 5, 2003."

re B.L.W., 843 A.2d 380, 383 (Pa.Super.2004). This Court is not impressed with her attempts at obfuscation. The record is clear that mother has failed to perform her parental duties and continued services through LCYS will not remedy the problems.

¶ 19 Appellant also argues there was no competent evidence to support a finding that termination was in N.W.'s best interests since the "sole" testimony pertaining to the child was from a foster parent who intended to adopt him. First we note an example of the unsupported, ungrammatical and patently unreasonable arguments appellant makes:

> The trial court also failed to consider that the all of the daughter's problems came as a result of the agency placing the child in inappropriate foster home for the time the child was in placement and not in the Appellant's care. The trial court did see to exclude as irrelevant as evidence that the Appellant's attorney sought bring out as to why the foster/adoptive parent was home-schooling the other children in her household. The Appellant argues that it could have demonstrated a bias, unfitnesness for placement, or that the agency was stripping Islamic children from their parents and placing them with radical home-schooling Christians.

Appellant's brief at 17–18 (transcribed exactly as it appears). We also note the child has spent at least two of the most formative years of his life with his foster parents whom he refers to as "mom and dad," and he appears to be thriving. N.T., 9/22/03, at 86–88, 114–118. We find that permitting the child to languish in foster care for untold months hoping that mother will suddenly begin to meet her child's needs, which she failed to do in the past, will not serve N.W.'s best interests; rather, we conclude the record supports a finding that a disposition terminating mother's parental rights, making him available for adoption by his foster parents, does serve his best interests.

¶ 20 We agree with the trial court that LCYS proved by clear and convincing evidence that termination of appellant's parental rights is proper pursuant to 23 Pa. C.S.A. § 2511(a)(5) and is in N.W.'s best interests. We need only agree with the trial court's decision as to any one subsection of 23 Pa.C.S.A. § 2511(a) in order to affirm the termination of parental rights. In re B.L.W., supra, at 384.

¶ 21 Order affirmed.

¶ 22 Judge GANTMAN concurs in the result.