J-S64029-19

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | | |
|---|---|---|
| IN THE INTEREST OF: H.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: D.M., II, NATURAL FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1141 WDA 2019 |

Appeal from the Order Dated July 10, 2019
In the Court of Common Pleas of Cambria County Domestic Relations at
No(s):  CP-11-DP-0000047-2018

BEFORE:   BOWES, J., LAZARUS, J., and PELLEGRINI, J.[*]

MEMORANDUM BY LAZARUS, J.:                         FILED DECEMBER 13, 2019

D.M. ("Father"), appeals from the order, entered in the Court of Common Pleas of Cambria County, changing the placement goal of his minor daughter, H.M. ("Child") (DOB 4/2/18), from reunification to adoption.  See 42 Pa.C.S.A. § 6351 et seq. (Disposition of dependent child).  Upon careful review, we agree with the trial court's determination that the evidence was sufficient to establish that changing Child's placement goal to adoption was in Child's best interest.  We affirm on the basis of the opinion authored by the Honorable Tamara R. Bernstein.

Child was removed from the care of Father and Mother[1] on April 3, 2018, the day after her birth.  Father was arrested on a bench warrant at the hospital

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] Mother is not a party to this appeal.

during Child's birth, and Mother was arrested on a bench warrant upon her discharge from the hospital. The court held a shelter care hearing on April 6, 2019. Following the hearing, the court ordered Child removed from Father's and Mother's care based on the established emergency, safety considerations, and the circumstances of the family. Cambria County Children and Youth Services ("CYS") placed Child with a foster family on April 4, 2018.[2]

On April 16, 2018, following an adjudication and disposition hearing, the court found Child dependent and ordered that she remain in foster care. CYS implemented a placement plan to return Child to parent or guardian.

The court held permanency hearings on September 26, 2018, and March 13, 2019. Following both hearings, the court found Father had failed to comply with the permanency plan and had made no progress towards alleviating the circumstances that necessitated the original placement. Specifically, Father failed to comply with a court-ordered drug and alcohol assessment, failed to comply with a court-ordered psychological evaluation, and failed to attend scheduled visitations. The court, nonetheless, maintained the reunification plan.

The court held a third permanency review hearing on June 28, 2019. Following the hearing, the court found that Father, despite services provided

---

[2] Child has remained with her foster family to date and foster parents are willing to provide permanency through adoption.

by CYS,[3] continued to neglect his obligations under the reunification plan. CYS noted in the permanency plan review that Father failed to complete his drug and alcohol assessment, failed to complete a psychological evaluation, failed to obtain and maintain housing for six months, and failed to attend medical appointments for Child. Since his release from incarceration in January 2019, Father missed eleven of fifteen scheduled visits. Based on these findings, the court concluded that CYS had met its burden of establishing a change in permanency plan to adoption to best address Child's need for a permanent and consistent environment. See 42 Pa.C.S.A. § 6351(f).

The court entered an order on July 10, 2019 changing the permanency goal to adoption. Father filed this appeal. He raises the following issue for our review: "Whether the trial court erred and/or abused its discretion when it changed the permanency goal for [Child] from "Return Home" to "Adoption." Brief of Appellant, at 4.

In reviewing an appeal from an order regarding a permanency goal change, we adhere to the following standard:

> In cases involving a court's order changing the placement goal . . . to adoption, our standard of review is abuse of discretion. To hold that the trial court abused its discretion, we must determine its judgment was manifestly unreasonable, that the court disregarded the law, or that its action was a result of partiality,

_____

[3] CYS provided services to Father, including, inter alia, parenting/counseling services; home management services; Cambria County Drug and Alcohol; Cambria County Adult Probation; psychological evaluation; Nulton Diagnostic and Treatment Center; Cambria County Orphan's Court legal representation; Indiana County Probation. CYS Exhibit 2, 6/28/19.

prejudice, bias or ill will. While this Court is bound by the facts determined in the trial court, we are not tied to the court's inferences, deductions and conclusions; we have a responsibility to ensure that the record represents a comprehensive inquiry and that the hearing judge has applied the appropriate legal principles to that record. Therefore, our scope of review is broad.

In re S.B., 943 A.2d 973, 977 (Pa. Super. 2008) (internal citations and quotation marks omitted). In addition, it is the responsibility of the trial court to evaluate the credibility of the witnesses and resolve any conflicts in the testimony. In re N.C., 909 A.2d 818, 823 (Pa. Super. 2006). Accordingly, "the trial court is free to believe all, part, or none of the evidence." Id. (citation omitted). Provided the trial court's findings are supported by competent evidence, this Court will affirm, "even if the record could also support an opposite result." In re Adoption of R.J.S., 901 A.2d 502, 506 (Pa. Super. 2006) (citation omitted).

Furthermore,

> [p]lacement of and custody issues pertaining to dependent children are controlled by the Juvenile Act [42 Pa.C.S.A. §§ 6301-6365], which was amended in 1998 to conform to the federal Adoption and Safe Families Act ("ASFA"). The policy underlying these statutes is to prevent children from languishing indefinitely in foster care, with its inherent lack of permanency, normalcy, and long-term parental commitment. Consistent with this underlying policy, the 1998 amendments to the Juvenile Act, as required by the ASFA, place the focus of dependency proceedings, including change of goal proceedings, on the child. Safety, permanency, and well-being of the child must take precedence over all other considerations, including the rights of the parents.
>
> At each review hearing for a dependent child who has been removed from the parental home, the court must consider the following, statutorily-mandated factors:

> [T]he continuing necessity for and appropriateness of the placement; the extent of compliance with the service plan developed for the child; the extent of progress made towards alleviating the circumstances which necessitated the original placement; the appropriateness and feasibility of the current placement goal for the child; and, a likely date by which the goal for the child might be achieved.

In re N.C., supra at 823 (citations and footnotes omitted) (emphasis in original).

We have carefully reviewed the record and the briefs filed in this matter. There is extensive evidence in the record to support the trial court's conclusion that Father made insufficient progress toward alleviating the circumstances that necessitated Child's original placement. Accordingly, we agree with the trial court's determination that, despite Father's testimony that he continues to work toward alleviating his issues, see N.T. Goal Change Hearing, 6/28/19, at 29-38, Child's best interest are served by changing the permanency placement goal from reunification to adoption. See In re N.C., supra at 823 ("When the child welfare agency has made reasonable efforts to return a foster child to his or her biological parent, but those efforts have failed, then the agency must redirect its efforts towards placing the child in an adoptive home."); see also In re Adoption of M.E.P., 825 A.2d 1266, 1276 (Pa. Super. 2003) ("[A] child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting.") (citations omitted).

We discern no abuse of discretion. In re S.B., *supra*. We affirm based on Judge Bernstein's comprehensive opinion, see Trial Court Opinion, 8/26/2019, at 3–12, and we direct the parties to attach a copy of that opinion in the event of further proceedings.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/13/2019

# IN THE COURT OF COMMON PLEAS OF CAMBRIA COUNTY, PENNSYLVANIA
## JUVENILE DIVISION

|  |  |  |
|---|---|---|
| IN THE MATTER OF: | * | Trial Court No.: CP-11-DP-47-2018 |
|  | * |  |
| H.M. | * |  |
|  | * | Superior Court Docket No: |
|  | * | **1141 WDA 2019** |
|  | * |  |
| APPEAL OF D.M., THE NATURAL | * |  |
| FATHER OF H.M. | * |  |
|  | * |  |
|  | * |  |

## OPINION PURSUANT TO RULE OF APPELLATE PROCEDURE 1925 (a)(2)

*Bernstein, J.:*

      This case comes before the Pennsylvania's Superior Court on D.M.'s (H.M.'s natural father) appeal of this Court's change of placement goal from Return to Father to Adoption. In his Concise Statement, Plaintiff's sole complaint is that this Court erred and/or abused its discretion in changing the goal. For the following reasons, D.M.'s appeal should be dismissed and this Court's Order of July 10, 2019, should be affirmed.

## SUMMARY OF THE CASE

      D.M.(hereinafter "Father") the appellant herein, is the natural father of H.M.[1] H.M. was removed from Mother's (J.D.) and Father's care on April 3, 2018, based on the Commonwealth's Shelter Care Application and Dependency Petition.[2] After a Shelter Care

---

[1] Since the subjects of this appeal are juveniles they will be referred to by their initials.

[2] According to the Shelter Care Application and the Dependency Petition, Mother and Father lacked the necessary resources to provide H.M. with his basic needs. Mother had an active bench warrant and was going to be arrested after being discharged from hospital after birthing H.M. and father was arrested for a bench warrant while in hospital during H.M.'s birth.

-Page 1 of 12-

hearing on April 6, 2019, this Court ordered H.M. removed from Father's and Mother's care based on the established emergency situation, safety considerations, and the circumstances of the family. [3] Preventive services were not offered prior to removal due to the emergency of the situation. Based on the findings, allowing H.M. to remain in the custody of Mother and Father would be contrary to H.M.'s welfare, and contrary to her best interest. The child was placed by Agency into foster care. SHELTER CARE ORDER, 04/11/2018. After an Adjudication and Disposition hearing on April 16, 2018, this Court found H.M. a Dependent and ordered that she remain in foster care. At this time, a placement plan to return to parent or guardian was adopted. ADJ. DIS. ORDER, 04/30/2018. After finding H.M. dependent, this Court held three Permanency Review hearings.[4] In the first two permanency reviews (September 26, 2018, and March 13, 2019), this Court found that Father had not complied with the permanency plan and had made no progress towards alleviating the circumstances which necessitated the original placement. Notwithstanding, this Court kept the current plan to return H.M. to Father.

On the third Permanency Review hearing, June 28, 2019, this Court found that Father: failed to complete psychological evaluation; did not obtain stable housing; did not attend consistent visitation, aggravated circumstances; did not comply with the permanency plan; did not comply with any court orders; and he could not remedy the causes of placement within a reasonable time. In sum, Father did not comply with the permanency plan and did not make sufficient progress towards alleviating the circumstances which necessitated the original placement. PERM. REV. ORDER, 07/10/2019. Based on these findings, this Court concluded that

---

[3] While no services were initiated for H.M., Mother and Father have had extensive services provided for other children.

[4] This Court held Permanency Review Hearing on: September 26, 2018; March 13, 2019; and June 28, 2019.

CYS met its burden of establishing a change in permanency plan to adoption to best address H.M.'s need for a permanent and consistent environment. *Id.*

Father timely filed Notice of Appeal and submitted a Concise Statement of Errors Complained of on Appeal (Concise Statement) pursuant to Pennsylvania Rule of Appellate Procedure 1925(a)(2)(i), which raises the sole issue of:

1. Did the Court err and/or abuse its discretion by finding that clear and convincing evidence existed to change the goal from Return to Father to Adoption?

For the reasons discussed below the appeal should be dismissed and this Court's Order dated July 10, 2019, should be affirmed and the appeal dismissed.

## DISCUSSION

Father's allegation of error relates to the Court's finding that a change in goal was necessary and appropriate to meet the needs of the child and was the safest and least restrictive placement.

Relative to the standard of review on appeals from a goal change proceeding, our Superior Court has explained that:

> When we review a trial court's order to change the placement goal for a dependent child to adoption, our standard is abuse of discretion. In order to conclude that the trial court abused its discretion, we must determine that the court's judgment was 'manifestly unreasonable,' that the court did not apply the law, or that the court's action was 'a result of partiality, prejudice, bias or ill will,' as shown by the record. We are bound by the trial court's findings of fact that have support in the record. The trial court, not the appellate court, is charged with the responsibilities of evaluating credibility of the witnesses and resolving any conflicts in the testimony. In carrying out these responsibilities, the trial court is free to believe all, part, or none of the evidence. When the trial court's findings are supported by competent evidence of record, we will affirm "even if the record could also support an opposite result.

*In re:* N.C., *supra,* at 822–23 (internal citations omitted).

In its opening provisions, the Juvenile Act ("Act") provides that one of its fundamental purpose is "[t]o preserve the unity of the family whenever possible or to provide another alternative permanent family when the unity of the family cannot be maintained." *42 Pa. §* *6301(b)(1)*. A child who has been adjudicated dependent may be separated from the child's parents only upon a showing of clear necessity. *Santosky v. Kramer,* 455 U.S. 745 (1982). Thus, the situations in which the state may intervene are limited, and its burden is very high. These restrictions derive from the interrelated beliefs that the family is one of our most important institutions, that a child's best interest is served by being raised within the family, and that the state should not unnecessarily intrude upon, and thereby weaken, the family.

While the primary goal of the Act is to preserve and reunite the family, it goes far beyond that opening statement of purpose. The Act also requires and provides a vehicle by which the court can remove children from the family environment when necessary for their welfare or in the interest of public safety. The Superior Court has stated that "[w]hile deference must be given to this laudatory goal, deference should not become rigid adherence to the principle regardless of the circumstances; otherwise, adoption will never be an option regardless of the family situation and the best interests of the child." *In re: J.S.W.,* 651 A.2d 167 170-71 (Pa. Super. 1994).

Once intervention by the state has occurred, the child stands in a different relationship to the parents than a child in an intact family whose rights are protected and whose needs are fulfilled by his parents. Removal of a child from his parents by the state can only occur on proof of neglect or dependency on the standard of clear and convincing evidence, *Santosky, supra,* and upon establishment of clear necessity following petition, notice, and hearing with the parent and child having the assistance of counsel, *see also,* 42 Pa. §§ 6301-6375 (Juvenile Act); *Helsel v. Blair County Children and Youth Serv.,* 519 A.2d 456 (Pa. Super. 1986)

(standard for adjudicating a child dependent is "clear and convincing evidence", as well as a showing of clear necessity). Once the child has been removed from the home it becomes the duty of the court to do that which its parents have failed to do and provide those things that are in the child's best interest. Accordingly, once a child has been removed from its parents the issues of custody, continuation of foster care and appropriateness of the goal are determined according to a child's best interests. *In re: Miller,* 552 A.2d 261 (Pa. Super. 1988). In these cases, the role of the court was summarized in *In re: Rosenthal, infra,*

> when the custody of children is the question, that the best interest of the children is the paramount fact. Rights of father and mother sink into insignificance before that. Even when father and mother are living together, a court has the power, if the best interests of the child require it, to take it away from both parents, and commit the custody to a third person. In other words, a court of chancery stands as a guardian of all children, and may interfere at any time, and in any way, to protect and advance their welfare and interests.

*In re: Rosenthal,* 157 A. 342, 343 (Pa. Super. 1921) *quoting Petition of Frank B. Bort,* 25 Kan. 308 (1881)).[5]

In the case *sub judice,* the state was forced to intervene on behalf of H.M. as Mother and Father lacked the necessary resources to provide H.M. with his basic needs. Mother had an active bench warrant and was going to be arrested after being discharged from hospital (after birthing H.M.) and father was arrested for a bench warrant while at hospital during H.M.'s birth. In fact, Father was incarcerated from April 2018 to January 2019. Here, the Commonwealth's intervention was necessary ensure that H.M.'s needs were met and that she was afforded the opportunity to enjoy a stable family life and to develop to the fullest extent of her potential. After removal, this Court held a Shelter Care hearing, an Adjudication and Disposition hearing, and Permanency Review hearings. Throughout these proceedings, Father

---

[5] The Opinion in *Petition of Fran B. Bort, supra,* was authored by then Kansas Supreme Justice Brewer, who would later become a United States Supreme Court Associate Justice.

and H.M. were assisted by counsel. H.M. was ultimately placed in foster home, with the goal to reunify with Father. While in foster care, H.M.'s basic needs have been met. The guiding principle here has always been H.M.'s best interest.

In a change of goal proceeding, the best interests of the child, and not the interests of the parent, must guide the trial court, and the parent's rights are secondary. *In re: M.S.,* 980 A.2d 612 (Pa. Super. 2009); *In re: A.K.,* 936 A.2d 528, 532–533 (Pa. Super. 2007); *In re: G.T.,* 897 A.2d 1197 (Pa. Super. 2006). The burden is on the agency to prove the *change* in goal would be in the child's best interest. *In re Interest of M.B.,* 674 A.2d 702, 704 (Pa. Super. 1996) citing *In Interest of Sweeney,* 574 A.2d 690, 691 (Pa. Super. 1990)).

As our Superior Court has explained:

> The policy underlying [the Act's] statutes is to prevent children from languishing indefinitely in foster care, with its inherent lack of permanency, normalcy, and long-term parental commitment. Consistent with this underlying policy, the 1998 amendments to the Juvenile Act, as required by the ASFA, place the focus of dependency proceedings, including change of goal proceedings, on the child. Safety, permanency, and well-being of the child must take precedence over all other considerations, including the rights of the parents.

*In re N.C.,* 909 A.2d 818, 823 (Pa. Super. 2006) (internal citations omitted) (emphasis added).

Regarding permanency, 42 Pa. CSA § 6351 provides, in pertinent part, the matters to be determined at permanency hearings. These include, *inter alia*: the necessity for and appropriateness of placement; the appropriateness, feasibility and extent of compliance with the permanency plan developed for the child; the extent of the progress made toward alleviating the circumstances which necessitated the original placement; the likely date by which the placement goal for the child might be achieved; and the child's safety. *42 Pa. CSA § 6351(f).* Additionally, upon placement of the child for 15 of the last 22 months or a determination by the court that aggravated circumstances exist and that reasonable efforts have been made to preserve and reunify the family, the court may determine whether continued reasonable efforts

to preserve or reunify need be made. *§ 6351 (f)(9)*. Based on determination of § 6351(f) factors, the court may determine whether the child will be placed for adoption, when in the best interest of the child. *§ 6351(f.1)*. In making this determination, the court may consider evidence that places the child's health, safety, or welfare at risk. *§ 6351(f.2)*. Based on the determination, the court shall order the continuation, modification or termination of placement or other disposition which is best suited to the safety, protection and physical, mental and moral welfare of the child. *§ 6351(g)*. Further, the Adoption and Safe Families Act, 42 U.S.C. §§ 671–679c, imposes upon states the requirement to focus on the child's needs for permanency rather than the parent's actions and inactions. With regard to permanency planning, the Legislature contemplated that, after reasonable efforts have been made to reestablish the biological relationship, the process of the agency working with foster care institutions to terminate parental rights should be completed within eighteen months. *See, In re: N.W.*, 859 A.2d 501, 508 (Pa. Super. 2004) *citing In re: G.P.R.*, 851 A.2d 967, 976 (Pa. Super. 2004).

To this end, the Superior Court has consistently held that, "a child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting." *In re: N.C.*, 909 A.2d 818, 824 (Pa. Super. 2006) *quoting In re Adoption of M.E.P.*, 825 A.2d 1266, 1276 (Pa. Super. 2003). As our Superior Court has stated:

> Permanency Planning is a concept whereby children are not relegated to the
> limbo of spending their childhood in foster homes, but instead, dedicated effort
> is made by the court and the children's agency to rehabilitate and unite the
> family in a reasonable time, and failing in this, to free the child for adoption.

*Interest of M.B.*, 449 Pa. Super. at 511, 674 A.2d at 704 *quoting Interest of Sweeney*, 393 Pa. Super. 437, 574 A.2d 690 (1990)). Unless these children were to remain in the limbo of foster care indefinitely, when the testimony and the record reveal that reunification with parents is unlikely to occur in the reasonably foreseeable future, a change of goal is necessary to serve

their best interests and permit children to achieve the permanent and stable family life they deserve. *See, In re: G.T.*, 897 A.2d 1197 (Pa. Super. 2006); *In re: K.D.*, 871 A.2d 823 (Pa. Super. 2005); and *In Interest of Lilley*, 719 A.2d 327 (Pa. Super. 1998).

Further, "if a parent fails to cooperate or appears incapable of benefiting from the reasonable efforts supplied over a realistic period of time, the agency has fulfilled its mandate and upon proof of satisfaction of the reasonable good faith effort, the termination petition may be granted." *In Interest of Lilley*, 719 A.2d 327, 332 (Pa. Super. 1998) *citing In re: J.W.*, 578 A.2d 952 (Pa. Super. 1990). The Act offers no guidance regarding the duration that services must be offered to a family prior to seeking a goal change. And, while the Act's goal is to preserve family unity whenever possible, to include the state taking the steps necessary to instruct the parents in the skills needed, and provide follow-up supervision in the home, *see In the Interest of Whittle*, 397 A.2d 1225, 1226 (Pa. Super. 1979), the Courts have also recognized that such services are costly and that an agency's resources are not unlimited, *In the Interest of M.A.*, 529 A.2d 31, 33 (Pa. Super. 1987), *appeal denied*, 538 A.2d 874 (Pa. 1988). Accordingly, an agency need not offer services indefinitely, particularly where the parents fail to afford themselves of the benefits of those services by refusing to cooperate or follow through with services.

It should noted that this Court has an extensive involvement history with this case. This Court first became involved in April 2018, when H.M. was removed from the parents' home because Mother and Father lacked the necessary resources to provide H.M.'s basic needs. Since H.M.'s removal, this Court held: a Shelter Care hearing (April 6, 2018), an Adjudication and Disposition hearing (April 16, 2018), and three Permanency Reviews (September 26, 2018, March 13, 2019, and June 28, 2019). After the March 13, 2019, Permanency Hearing, this Court found Aggravated Circumstances existed; to wit, parents failed to maintain substantial

and continuing contact with H.M. for a period of six months. Notwithstanding Father's failure to comply with the permanency plan, this Court's determination to adopt a concurrent placement plan of adoption did not come until after the third Permanency Review hearing on June 28, 2019.

In that hearing, the testimony presented established that Father did not comply with the permanency plan and he did not make sufficient progress to alleviate the conditions which necessitated the original placement. More specifically, the evidence established that Father failed to maintain consistent visitation with H.M. To support this finding this Court relied on Carol Crouse's, Cambria County CYS's Caseworker (hereinafter "Caseworker"), testimony. She testified that from April 2018 through January 2019, Father was not able to maintain visitation with H.M. because Father was incarcerated. N.T. 06/28/2019, at 6-7. However, upon Father's release from custody until June 2019, Father attended a total of four (4) out of fifteen visitations. *Id.* at 18. While this Court finds Father's testimony, that he missed some visitations because he was ill with scabies, credible, the reality is that by Father's admission he was cured at the end of March 2019. *Id.* at 32-35. Nonetheless, from the period from which Father was cured until the June 2019 hearing, Father attributed missing "many visitations" because he did not have "bus money," and to his struggles. *Id.* at 34.

The testimony also established that Father was unable to provide H.M. with stable housing. H.M.'s Caseworker testified that Father reported to the Agency that he was staying with various friends, *Id.* at 4, or "couch surfing," *Id.* at 17. While Father disputes that he was couch surfing, Father indicated that his housing situation was not stable. Indeed, he indicated that he lives in a half-double with his aunt, two of his aunt's friends, and three dogs. *Id.* at 37. He added that the informed agency that he was couch surfing because he did not feel his aunt's house was "clean enough" to receive CYS services at the house. *Id.* Father indicated that he

applied for public housing and that, as of the hearing, he was approximately one and one-half month away from receiving a two-bedroom apartment. *Id.* at 31.

Additionally, the testimony established that Father has failed to comply with the permanency plan. While Father testified that he had began addressing his mental health through blended case and peer support programs at Nulton's in April 2019, *id.* at 30, Father did not complete this Court's ordered mental health evaluation, *id.* at 16. Father was offered Independent Family Services Parenting Services and Independent Family Services Home Management Services, which he has not participated in. *Id.* at 4-5.

While the Court was encouraged by Father's improvements of: attending the Day Reporting Center, where he attends drug and alcohol abuse classes, *Id.* at 29, and only tested positive in one drug test (for which he had a prescription for the substance he tested positive) *id.* at 17; applying for public housing, *id.* at 31; and enrolling in Nulton's mental health treatment, *id.* at 30, the Court found, this progress was not sufficient and a change of placement plan was in H.M.'s best interest.

As the Court explained, the Court is required to provide permanency to H.M. While the Court was encouraged that Father had applied for housing, as of this hearing father had not received housing. Moreover, once Father received housing, he would have to show that he could maintain housing. *Id.* at 40. This is of concern to this Court in light of Father's testimony that he is unemployed and his stated plan to provide for his family is to receive social security for back issues; his social security has not yet been approved. *Id.* at 32. Furthermore, Father's testimony that he did not furnish CYS with his current living address for Agency to establish services because the house was not clean was also of concern to the Court, because Father could have cleaned the house to allow services. *Id.* at 40. But, he failed to do so.

Also of concern to this Court was that father did not comply with the placement plan. For example, while this Court is sensitive to Father's health issues (scabies), the fact that Father missed many visitations after he was cured because he did not have money for the bus, and because of his struggles, is worrisome to this Court. Especially in light of Father's testimony that he has trouble performing simple tasks. *Id.* at 35. Ultimately, although encouraged that Father is on the right track by addressing his mental health, and appears to be staying away from drugs, he is just at the starting point and Father would need to show that he could maintain this progress.

In light that H.M. has been in placement for approximately 14 months and the testimony revealed that reunification with Father is unlikely to occur in the reasonably foreseeable future, a change of goal is necessary and in H.M.'s best interests to allow him a to have a permanent and stable family life. Allowing Father an additional six months, but in reality Father would likely need more time, would place H.M.'s life on hold hoping that Father will summon the ability to handle his responsibilities. Indeed, by not changing the placement plan this Court would relegate H.M. to the limbo of spending his childhood in foster homes. This would not only be contrary to the concept of permanency planning, it would also be clearly averse to H.M.'s best interest. Additionally, having determined that aggravated circumstances exist and that reasonable efforts have been made to preserve and reunify the family, this Court believes that continuing reasonable efforts to preserve or reunify need not be made as the Agency does not need to provide costly services indefinitely. Here, Father has failed to cooperate from the reasonable efforts over a realistic period of time. Therefore, the agency has fulfilled its mandate, and a change of placement plan is appropriate.

Finally, the change of a goal from return home to adoption does not terminate Father's parental rights; it is only the first step in the process. *See, In re: S.B.,* 943 A.2d at 978; *In re:*

*N.C.,* 909 A.2d at 824; and *In re:* A.L.D., 797 A.2d 326, 339 (Pa. Super. 2002). As a practical matter, the goal change simply identifies adoption as the favored disposition and relieves CYS from its obligation to continue to provide a parent further services. *In re: N.W.,* 859 A.2d 501, 509 (Pa. Super. 2004). Father may yet be able to overcome his deficiencies and demonstrate to either this Court at the next review hearing, or to the Orphans' Court[6] at a future termination proceeding, that he is now able to parent H.M. and that his parental rights should not be terminated. However, the burden of continuing towards that goal now rests with Father and he must obtain the services necessary to reach that goal outside of the Agency. Accordingly, based on all the evidence produced during this matter the goal change was proper and there is no merit to this allegation of error.

For aforementioned reasons, the appeal should be dismissed and this Court's Order of July 10, 2019, should be affirmed.

**RESPECTFULLY SUBMITTED,**

_____
Tamara R. Bernstein, *J.*

August 26, 2019

---

[6] Terminations of parental rights proceedings occur in a different division and before a different judge of this Court.