J-S28022-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| IN THE INT. OF: L.P., A MINOR | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: A.P., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 314 MDA 2020 |

Appeal from the Order Entered January 29, 2020
In the Court of Common Pleas of Lancaster County Juvenile Division at
No(s):  2019-00451,
CP-36-DP-0000224-2017

| IN RE: L.A.P., A MINOR | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: A.P., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 330 MDA 2020 |

Appeal from the Decree Entered January 29, 2020
In the Court of Common Pleas of Lancaster County Orphans' Court at
No(s):  2019-00451

BEFORE:  BOWES, J., OLSON, J., and MUSMANNO, J.

MEMORANDUM BY OLSON, J.:                    **FILED SEPTEMBER 15, 2020**

Appellant, A.P. (hereinafter "Father"), appeals from the decree entered

on January 29, 2020, which granted the petition filed by the Lancaster County

Children  and  Youth  Social  Service  Agency  (hereinafter  "the  Agency")  to

terminate Father's parental rights to his minor child, L.P. a/k/a L.A.P. (a male born in October 2017) (hereinafter "Child").[1]  We affirm.

In October 2017, Child was born premature at Reading Hospital, in Berks County, Pennsylvania; Child was born addicted to opiates and suffering from neonatal abstinence syndrome.  *See* Petition for Temporary Custody, 10/13/17, at 1.  As a result, on October 13, 2017, the Agency filed a petition for temporary custody and, on October 31, 2017, the trial court adjudicated Child dependent, pursuant to 42 Pa.C.S.A. § 6302(1).  *See* 42 Pa.C.S.A. § 6302(1) (defining "dependent child" as "a child who . . . is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals").

On June 4, 2019, the Agency filed a petition to terminate Mother and Father's parental rights to Child.  As the trial court explained:

> The [trial court] held a hearing on the Agency's termination of parental rights petition on October 24, 2019.  At that time, Father, by counsel, presented [a] motion to dismiss [the dependency and termination of parental rights actions for lack of subject matter jurisdiction]. . . . [Father electronically filed the motion to dismiss] the next day (October 25, 2019) with the clerk of courts.

Trial Court Opinion, 1/24/20, at 2 (some capitalization omitted).

---

[1] Also on January 29, 2020, the trial court terminated the parental rights of L.I.L. (hereinafter "Mother") to Child.  Mother did not file a notice of appeal from this decree and she is not a party to this appeal.

Within Father's motion to dismiss, Father claimed that the Court of Common Pleas of Lancaster County did not possess subject matter jurisdiction over the dependency or the termination of parental rights action because Mother and Father live in Berks County, Pennsylvania and Child was born in Berks County. *See* Father's Motion to Dismiss, 10/25/19, at 1-5. Father requested that the trial court enter an order dismissing both actions for lack of subject matter jurisdiction. *Id.* at 5.

The Agency opposed Father's motion to dismiss and argued that: the Court of Common Pleas of Lancaster County possesses subject matter jurisdiction over the actions because the courts of common pleas have unlimited original jurisdiction over all proceedings in this Commonwealth, unless otherwise provided by law; Father was confusing subject matter jurisdiction with venue; and, "[a]ny objection to venue was waived long ago because it was not raised prior to the adjudication as required under the Juvenile Rules of Procedure." The Agency's Brief in Opposition, 11/19/19, at 4-10.

Following the Agency's brief in opposition, Father filed a reply brief and specifically argued: "[Father's counsel] does not recall ever bringing the issue of venue before th[e trial] court (it would be moot to do so as venue was waived after the adjudicatory hearing was held October 24, 2017). [Father's counsel is] limiting [Father's] argument to that of jurisdiction." Father's Reply Brief, 12/4/19, at 2.

On January 24, 2020, the trial court denied Father's motion to dismiss. Trial Court Order, 1/24/20, at 1. After a termination of parental rights hearing, the trial court made the following findings of fact:

1. [Child] was born on October 3, 2017. . . . [Child] was placed in the Agency's temporary custody by order signed and filed on October 13, 2017.

2. [Child] was diagnosed with neonatal abstinence syndrome at birth. [Child] was treated in the neonatal intensive care unit following his birth and before he was discharged directly into the Agency's custody. [Child] continued to suffer from difficulty with breathing and cardiac irregularities for at least the first [three-and-a-half] months of his life.

. . .

10. Father was incarcerated at Berks County Prison two weeks after [Child] was born. Father was consistently incarcerated from that time forward.

11. Father was incarcerated at the Berks County Prison because the Lancaster County Office of Adult Probation had issued a warrant for Father's arrest for non-compliance. Father had been on the run from Lancaster County authorities.

12. Father remained at the Berks County Prison until November 18, 2018, at which time he was transferred to [State Correctional Institution ("SCI")] Phoenix. Father remained at SCI-Phoenix until January 22, 2019, when Father was transferred to SCI-Houtzdale.

13. Before Father's transfer to SCI-Phoenix, Father completed drug and alcohol programs at Berks County Prison. The Agency accepted Father's completion of these programs in satisfaction of Father's drug and alcohol objective, rendering that objective ongoing as opposed to incomplete.

14. At the time of the August 1, 2019[] hearing, Father was in "parole pending" status, meaning that Father was waiting upon final state parole board action.

15. Father was originally paroled on March 9, 2015.

16. Presently, Father's re-computed parole violator maximum date is March 20, 2027.

17. While incarcerated, Father completed a Core Skills program. The objective of this program was to learn how to think first before acting.

18. Father participated in the Read to Your Child program [while] in prison. In this program, a parent records a video of the parent reading a book[,] which is then sent to the parent's child.

19. Father sent [Child] a book and a CD with a video recording of Father reading the book aloud. [Child] enjoy[ed] Father's video.

20. Father completed a violence prevention program in prison.

21. Father has three other children, A.P.1 [(born in July 2001)], A.P.2 [(born in November 1999)], and A.P.3 [(born in April 1996)].

22. The mother of A.P.1 is [S.P. S.P.] is also the mother of the Mother of [Child].

23. The Agency was previously involved with one of Father's other children, A.P.2, in August [] 2016.

24. Father had been estranged from A.P.2 until A.P.2 was three years old and then in 2015, A.P.2 came to the United States to become acquainted with Father.

25. Father requested genetic testing to determine if [he were] the biological father of A.P.2, which resulted in a court granting sole custody to A.P.2's mother pending the results of the genetic testing.

26. The report that the Agency received regarding A.P.2 was that A.P.2 was involved in a sexual relationship with one of A.P.2's aunts.

27. At the time of the report, Father was in a relationship with Mother.

28. At the time of the report, A.P.2 was in Father's custody. Other members of Father's household included Mother and an aunt, [C.T.]

29. The report stated that A.P.2 was engaged in sexual relations with Mother.

30. Subsequently, the Agency was able to confirm with A.P.2 that A.P.2 was having sexual relations with both [C.T.] and Mother while A.P.2 and both women were living in Father's household.

31. The Agency's investigation led to the indication of both [C.T.] and Mother as perpetrators of sexual abuse against A.P.2.

32. A.P.2 had been under house arrest with Juvenile Probation at the time these relationships were transpiring but A.P.2 had cut off his ankle bracelet monitor.

33. When Father caught A.P.2 having sex with Mother, Father turned A.P.2 into Juvenile Probation.

34. Ultimately, A.P.2 was released to the custody of his mother[,] who resided in Trinidad and Tobago.

. . .

36. The first report the Agency received regarding A.P.1 was on March 22, 2016.

37. The report stated concerns for truancy and neglect of A.P.1 and that A.P.1's parents, Father and [S.P.], were in and out of jail.

38. The Agency recently received a report regarding A.P.1, who was with Mother when Mother was charged with retail theft.

39. Father did not raise his son A.P.2 or his daughter A.P.1.

40. Father never lived with his daughter A.P.1.

41. Father maintains written correspondence with [Child's] resource mother.

42. Father claims to have a residence that he can move to upon his release from prison.

43. As of the time of the final hearing on the Agency's termination of parental rights petition, Father desired that [Child] live with [C.H.], who Father says is a cousin of his living in Philadelphia.

. . .

47. Father came to Lancaster in 1998 for the purpose of selling illegal drugs.

48. As matters stand now, Father will owe $35,521.13 in fines and costs when Father is released from prison.

49. Father now concedes that he hurt his back at work sometime in 2015 and was prescribed Percocet which Father was taking while at work which affected his job performance.

50. Father's addiction to Percocet set Father back resulting in his latest spurt of criminal activity.

51. Father now claims that if Father's wife [were] cheating on him, Father would not turn to marijuana for the emotional pain as he did in the past.

52. Father claims he knows what it takes to be a good parent, but Father also acknowledges that he lacks parenting skills and that the classes he took are insufficient.

53. Father claims he is now a "new creation by the grace of God, the lord and Savior, Jesus Christ, and has been reborn by the blood."

54. Father believes that [Child] will not be hurt by being removed from [Child's] resource family – the only family [Child] has known – because [Child] is young.

55. Father knows that this is his last chance to try to be a father to [Child].

56. Assuming that Father would be granted parole by the state parole board, Father has at least another six months to serve on an open sentence he received in Berks County.

57. As of the final hearing date, when Father is released, Father will need to complete a mental health evaluation, a drug and alcohol evaluation, must remain crime-free, must compete a parenting class, must become financially stable, must have appropriate housing for himself and [Child], and must demonstrate ongoing commitment to [Child] in order to complete the objectives of the applicable child's permanency plan. Father would also need to be assigned and work with a personal parent trainer, remain compliant with his terms of probation, and his housing would have to be assessed.

58. [Child's] resource parents, with whom [Child] has lived since he was discharged from the hospital [23] days after his birth, are a potentially permanent resource for [Child] and are interested in adopting him.

59. [Child] refers to the resource parents as "Mom and Dad." [Child] looks to the resource parents for comfort.

60. The resource parents' home also includes two older girls who are in foster care. [Child] is beneficially bonded to these two girls.

. . .

62. As of the time of the final hearing on the Agency's termination of parental rights petition . . . , [Child] had been in the Agency's legal and physical custody consistently for more than [24] months.

Trial Court Opinion, 3/23/20, at 5-15 (citations and some capitalization omitted).

The trial court concluded that the Agency proved, by clear and convincing evidence, that Father's parental rights to Child should be terminated under 23 Pa.C.S.A. §2511(a)(1), (2), and (b). The trial court thus granted the Agency's petition to terminate Father's parental rights to Child on January 29, 2020. Trial Court Order, 1/29/20, at 1.[2]

Father filed timely notices of appeal. He raises two claims to this Court:

> [1.] Whether the [trial] court erred in its order dated January 24, 2020, that denied [Father's] motion to dismiss the dependency action, and by extension, the termination of parental rights regarding [Child] due to lack of subject matter jurisdiction and/or venue[?]
>
> [2.] Whether the Orphan's Court erred in its decree dated January 23, 2020, that the Lancaster County Children and Youth Social Services Agency had met its burden in proving that Father's parental rights should be terminated when there was evidence he was working on and completing his goals on his child permanency plan throughout his incarceration and would be released soon[?]

Father's First Brief at 14 (some capitalization omitted); Father's Second Brief at 8 (some capitalization omitted).[3]

_____

[2] The trial court appointed Attorney Gina M. Carnes as guardian *ad litem* for Child. Attorney Carnes filed a brief in this case in which she asserts that termination of Father's parental rights was in the best interest of Child. Thus, she asks this Court to affirm the trial court's order terminating Father's parental rights. Brief of Appellee, Guardian Ad Litem, 5/27/20, at 20.

[3] We initially filed our memorandum in this case on July 8, 2020. However, after we filed our memorandum, Father filed an application for reargument

and complained that our memorandum dealt exclusively with the issue Father briefed at docket number 314 MDA 2020, regarding the subject matter jurisdiction of the courts of common pleas. According to Father, our memorandum mistakenly failed to address the issue he raised in a separate and consolidated brief – concerning docket number 330 MDA 2020 – where he claimed that the trial court erred "in deciding the Agency had met its burden and that [Father's] parental rights should be terminated when he was making substantial progress." **See** Father's Application for Reconsideration, 7/15/20, at 1-3.

We searched our appellate docket and again saw that Father filed multiple copies of a single brief in this matter. Further, we observed that all copies of Father's brief simply raised the issue of subject matter jurisdiction. Therefore, we granted panel reconsideration to apprise Father of the fact that we found only one set of briefs and that we discovered no separate brief that dealt with any claim that the trial court erred "in deciding the Agency had met its burden and that [Father's] parental rights should be terminated when he was making substantial progress." **See id.**

Father then filed another application for reargument and informed this Court that he electronically filed both appellate briefs in one single, long document. **See** Appellant's Second Application for Reargument, 8/12/20, at 4. Thus, Father's "first" brief (dealing with the subject matter jurisdiction issue) was found at pages 1-44 of the filing and Father's "second" brief (dealing with the sufficiency of the evidence supporting termination) was found at pages 45-94 of the document. Father claimed that, since he actually filed both briefs in this case, we should address the claim raised in his "second" brief. **Id.**

We instruct Father that filing two briefs in one document violates our Rules of Appellate Procedure in multiple ways. **See**, **e.g.**, Pa.R.A.P. 2111 (specifying the requirements for an appellant's brief); **see also** Pa.R.A.P. 125 (declaring that "[e]lectronic filing of documents shall be governed by Administrative Orders of the Supreme Court of Pennsylvania"); **In re: Electronic Filing System in the Appellate Courts**, 418 J.A. Docket, at II(A) (Pa. 2014) ("Electronic filings may be submitted at the UJS web portal: http://ujsportal.pacourts.us . . . , **in accordance with the filing instructions available at that site**") (emphasis added). Further, it is not this Court's responsibility to discover briefs that are improperly contained within or after another brief. Thus, we are empowered to hold that Father waived any claim contained in his "second" brief – as that "brief" violates multiple Rules of Appellate Procedure, the brief was not separately filed, no

First, Father claims that the trial court erred when it refused to dismiss the dependency action for lack of subject matter jurisdiction. This claim fails.

At the outset, we note that in his appellate brief, Father argues that the trial court erred when it failed to transfer the case to Berks County, on the basis of improper venue. *See id.* at 14 and 19. This claim of error is waived, as Father did not raise the claim in his concise statement of errors complained of on appeal and, at the trial level, Father expressly disclaimed any objection to venue. *See* Father's Concise Statement, 2/20/20, at 1 (limiting his challenge to that of subject matter jurisdiction); Father's Reply Brief, 12/4/19, at 2 ("[Father's counsel] does not recall ever bringing the issue of venue before th[e trial] court (it would be moot to do so as venue was waived after the adjudicatory hearing was held October 24, 2017). [Father's counsel is] limiting [Father's] argument to that of jurisdiction"). Any claim on appeal relating to venue is thus waived. *See* Pa.R.A.P. 1925(b)(4)(vii); Pa.R.A.P. 302(a) ("[i]ssues not raised in the lower court are waived and cannot be raised for the first time on appeal."); *see also In re M.Z.T.M.W.*, 163 A.3d 462,

_____

separate filing fee could have been paid for this brief, and the brief is, essentially, an appendix to Father's "first" brief.

Nevertheless, we note that Father is proceeding on appeal *in forma pauperis* – and, thus, was not required to pay filing fees for his briefs. We further note that Father has a constitutional right to effective assistance of counsel in this termination of parental rights proceeding, but that "claims of ineffective assistance of counsel must be raised on direct appeal." *In re J.T.*, 983 A.2d 771, 774-775 (Pa. Super. 2009). Therefore, we granted Father's second application for panel reargument and will now address the claim contained in Father's "second" brief.

465-466 (Pa. Super. 2017) (in a termination of parental rights case, holding that the mother had waived her appellate claims because they were not included in her concise statement of errors complained of on appeal and were not adequately developed in her appellate brief). Therefore, our review in this case is limited to Father's claim that the trial court did not possess subject matter jurisdiction over the action. *See* Father's Brief at 14.

Father's challenge to the trial court's subject matter jurisdiction is a pure question of law. *S.K.C. v. J.L.C.*, 94 A.3d 402, 406 (Pa. Super. 2014). As such, "our standard of review is *de novo* and our scope of review is plenary." *Stapas v. Giant Eagle, Inc.*, 198 A.3d 1033, 1037 (Pa. 2018).

As our Supreme Court has explained, "[s]ubject matter jurisdiction concerns the competency of the court to determine controversies of the **general class** to which the case presented for its consideration belongs." *In re Nomination Petition of deYoung*, 903 A.2d 1164, 1168 (Pa. 2006) (quotations and citations omitted) (emphasis in original). It is uncontested that jurisdiction to hear and determine dependency and termination of parental rights actions is vested in the courts of common pleas. *See* 42 Pa.C.S.A. § 931(a) (providing that, except where otherwise specified by statute or rule, "the courts of common pleas shall have unlimited original jurisdiction of all actions and proceedings"); *In re N.W.*, 859 A.2d 501 (Pa. Super. 2004) (discussing the fact that the courts of common pleas possess original jurisdiction over dependency and termination of parental rights actions).

In this case, the dependency and termination of parental rights actions were brought and decided in the Lancaster County Court of Common Pleas, which was competent to determine controversies in these general classes. As such, the Lancaster County Court of Common Pleas had subject matter jurisdiction over these actions and Fathers' claim on appeal thus fails.[4]

Next, Father claims that the evidence was insufficient to terminate his parental rights to Child.

In reviewing an appeal from an order terminating parental rights, we adhere to the following standard:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. ***In re: R.J.T.***, 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for

---

[4] To the extent Father claims that the Lancaster County Court of Common Pleas did not have subject matter jurisdiction over the action because the Agency did not have standing to initiate the dependency or termination of parental rights actions, Fathers' claim fails. ***See In re Nomination Petition of deYoung***, 903 A.2d at 1168 ("[s]ubject matter jurisdiction concerns the competency of the court to determine controversies of the general class to which the case presented for its consideration belongs. . . . Whether a party has standing to maintain an action is not a jurisdictional question") (quotations and citations omitted); ***In re Adoption of Z.S.H.G.***, 34 A.3d 1283 (Pa. Super. 2011) (applying ***deYoung*** in the context of a challenge to termination of parental rights and adoption decrees).

an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.

As [the Supreme Court] discussed in *R.J.T.*, there are clear reasons for applying an abuse of discretion standard of review in these cases. [The Supreme Court] observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. *R.J.T.*, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*In re Adoption of S.P.*, 47 A.3d 817, 826-827 (Pa. 2012) (some citations omitted).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009). As we have explained, "[t]he standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Id.* (quotations and citations omitted).

"Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis." *In re B.J.Z.*, 207 A.3d 914, 921 (Pa. Super. 2019). We have explained:

Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*Id.* (quotations and citations omitted).

Here, the trial court terminated Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1) and (2). This Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of section 2511(a). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). In this appeal, we concentrate our analysis on Section 2511(a)(2).

In relevant part, Section 2511 declares:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

. . .

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the

- 15 -

> conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . .
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511.

Thus, to satisfy the requirements of Section 2511(a)(2), the moving party must prove "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In re C.M.K.*, 203 A.3d 258, 262 (Pa. Super. 2019) (citations omitted).

"The grounds for termination are not limited to affirmative misconduct, but concern parental incapacity that cannot be remedied." *Id.* "[A] parent's incarceration is relevant to [a] [S]ection [2511](a)(2) analysis and, depending on the circumstances of the case, it may be dispositive of a parent's ability to provide the 'essential parental care, control, or subsistence' that the section

contemplates." ***In re A.D.***, 93 A.3d 888, 897 (Pa. Super. 2014) (citation omitted).

Further, as the Pennsylvania Supreme Court stressed:

> A decision to terminate parental rights, never to be made lightly or without a sense of compassion for the parent, can seldom be more difficult than when termination is based upon parental incapacity. The legislature, however, in enacting the 1970 Adoption Act, concluded that a parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties.

***In re Adoption of S.P.***, 47 A.3d at 827 (quotations and citations omitted).

We additionally note that this Court has long recognized a parent is required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. ***In re A.L.D.***, 797 A.2d 326, 337 (Pa. Super. 2002). A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous. ***Id.*** at 340.

As the trial court explained, the Agency proved, by clear and convincing evidence, that Father's parental rights should be terminated under Section 2511(a)(2):

> Father has been incarcerated the entire time that [Child] has been in the care of the Agency. Father's decisions and actions resulted in Father's lengthy and continuous incarceration and have caused Father to be unavailable to parent [Child] for virtually the entirety of [Child's] life. While Father has undergone some counseling and programming during his incarceration, there is little evidence that Father is capable of parenting [Child]. Father as much as admitted that he is incapable as a parent despite his participation in such programming. Father has demonstrated lack of

capacity and a disturbing lack of interest in the past in respect to his older children, whom he never actively parented. Father's engagement in a self-centered criminal lifestyle is the hallmark of his adulthood. Historically, in the context of his older children, Father forfeited every opportunity to perform parental duties, and even went so far as to deny paternity of one of his children (whom he now acknowledges) when custody litigation in respect to that child was well underway. In the instant case, Father and Mother dodged Father's identification as the biological father of [Child] for months after [Child] was taken into the care of the Agency. [The trial] court must consider that past behavior is often the best predictor of future behavior. In such light, Father's claims that he is now a "new creation by the grace of God, the lord and savior, Jesus Christ, and has been reborn by the blood" are disingenuous, are not credible, and are not persuasive.

Father's affirmative steps in participating in programming during Father's incarceration are laudable, but nevertheless are nominal. Such steps are wholly insufficient when considered in the context of all that remains to be done before Father could even possibly be in a position to provide [Child] with timely permanency during [Child's] formative years. Father, in essence, would need to pursue from scratch every objective contained in [Child's] permanency plan [the trial] court awarded him almost two years ago. In the best possible scenario (from Father's perspective) wherein he is paroled by the state parole board at the first opportunity and then he serves the approximately six months' time remaining on his yet to be satisfied Berks County sentence, he could not even begin that process until [Child] is three and a half years old. Father displayed a profound lack of understanding of child development and lack of empathy for [Child] when he expressed a belief that [Child] would suffer no trauma if [Child] is removed from the only home he has ever known to be placed in Father's care.

Trial Court Opinion, 3/23/20, at 18-20 (citations omitted).

We conclude that the trial court was well-within its discretion when it concluded that Father met the conditions for termination delineated in Section 2511(a)(2). Father's claim to the contrary fails.

This Court has stated that the focus in terminating parental rights under section 2511(a) is on the parent, but it is on the child pursuant to section 2511(b). *See In re Adoption of C.L.G.*, 956 A.2d 999, 1008 (Pa. Super. 2008) (*en banc*). In reviewing the evidence in support of termination under section 2511(b), our Supreme Court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). In *In re E.M.*, [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791.

*In re: T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, section 2511(b) does not require a formal bonding evaluation." *In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010) (internal citations omitted). Although it is often wise to have a bonding evaluation and make it part of the certified record, "[t]here are some instances . . . where

direct observation of the interaction between the parent and the child is not necessary and may even be detrimental to the child." **In re K.Z.S.**, 946 A.2d 753, 762 (Pa. Super. 2008).

A parent's abuse and neglect are likewise a relevant part of this analysis:

> concluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound. If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent . . . Nor are we of the opinion that the biological connection between [the parent] and the children is sufficient in of itself, or when considered in connection with a child's feeling toward a parent, to establish a *de facto* beneficial bond exists. The psychological aspect of parenthood is more important in terms of the development of the child and [his or her] mental and emotional health than the coincidence of biological or natural parenthood.

**In re K.K.R.-S.**, 958 A.2d 529, 535 (Pa. Super. 2008) (citations and quotations omitted). Thus, the court may emphasize the safety needs of the child. **See In re K.Z.S.**, 946 A.2d at 763 (affirming involuntary termination of parental rights, despite existence of some bond, where placement with mother would be contrary to child's best interests).

Our Supreme Court has stated that the mere existence of a bond or attachment of a child to a parent will not necessarily result in the denial of a termination petition, and that "[e]ven the most abused of children will often harbor some positive emotion towards the abusive parent." **See In re: T.S.M.**, 71 A.3d 251, 267 (Pa. 2013) (quoting **In re K.K.R.-S.**, 958 A.2d 529,

535 (Pa. Super. 2008)). The Supreme Court stated, "[t]he continued attachment to the natural parents, despite serious parental rejection through abuse and neglect, and failure to correct parenting and behavior disorders which are harming the children cannot be misconstrued as bonding." *See In re: T.S.M.*, 71 A.3d at 267 (*quoting In re Involuntary Termination of C.W.S.M.*, 839 A.2d 410, 418 (Pa. Super. 2003) (Tamilia, J. dissenting)).

While Father may claim to love Child, a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights. *In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010). We stated in *In re Z.P.*, a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." *Id.* at 1125. Rather, "a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." *In re B., N.M.*, 856 A.2d 847, 856 (Pa. Super. 2004).

Here, the trial court explained, termination of Father's parental rights would be in the best interests of Child:

> While Father sought visitation with [Child] at the state correctional institution where he was housed (and [the trial court] sought and eventually ordered an appropriate mechanism for such visitation to occur), the reality is that Father is not known to [Child] and [Child] could not have a bond of any sort with Father. Based upon the totality of the circumstances, [Child] will suffer no measurable negative consequence stemming from the termination of Father's

- 21 -

parental rights. Rather, [Child] has been in the capable hands of his resource parents who have supplied his emotional and physical needs and who have nursed him back from the prenatal injuries inflicted upon him through his biological parents' drug-saturated lifestyle. [Child] deserves proper parenting and the fulfillment of [Child's] potential in a permanent, healthy, and safe environment.

[Child] must remain in the nurturing, loving, and stable home of his resource family. It is in [Child's] best interest that Father's parental rights [be] terminated.

Trial Court Opinion, 3/23/20, at 23.

Our review of the record demonstrates that there is sufficient, competent evidence in the record that supports the trial court's factual and legal determinations. Thus, we will not disturb the trial court's decision. *In re Adoption of S.P.*, 47 A.3d at 826-27. Accordingly, we affirm the trial court's decree terminating Father's parental rights to Child pursuant to section 2511(a)(2) and (b) of the Adoption Act.

Decrees affirmed. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/15/2020

- 22 -